Bergan, J.
Defendant was arraigned in the Nassau County Court June 13, 1967 on an indictment charging robbery, larceny and assault. His trial began some 16 months later, September 30, 1968. He was convicted and sentenced. The main question on appeal is appellant’s contention that the delay unreasonably deprived him of his constitutional and statutory right to a prompt trial.
Since appellant would have been in prison under a conviction on a unrelated charge during all the period between arraignment and trial, the question of incarceration or release on bail or other recognizance during the period before trial is not presented. On April 28, 1967 he had been sentenced to five years in prison in Suffolk County for another felony, and was brought from prison for arraignment June 13. It was while on bail between conviction and sentence in Suffolk that this present crime was committed March 18,1967.
Although the personal disability of incarceration without bail while awaiting trial is one of the “ threefold purposes ” underlying the constitutional and statutory rule for prompt trial, as Judge Fuld wrote in People v. Prosser (309 N. Y. 353, 356), a man in prison on another charge is also entitled to prompt trial for the reasons developed in Prosser. Subsequent case law is in this direction (People v. Wallace, 26 N Y 2d 371; People v. Winfrey, 20 N Y 2d 138; People v. Bryant, 12 N Y 2d 719; People v. Peters, 16 A D 2d 171; People v. Masselli, 11 A D 2d 722).
*422 In the cases of undue trial delay that have arisen, some failure or inadvertence has been attributable to the prosecutor. (People v. Wallace, supra; People v. Winfrey, supra; People v. Bryant, supra; People v. Piscitello, 7 N Y 2d 387.) This element is especially notable in Klopfer v. North Carolina (386 U. S. 213) where the prosecutor’s purpose was to keep the charge indefinitely in suspense under a nolle prosequi.
But it is not possible to attribute the 16-month delay shown on this record to the prosecutor who was steadily ready for trial. Nor is it attributable to the defendant who also was consistently ready for trial with the exception of short periods while counsel were being substituted—periods which played no significant part in the total delay. Defendant also promptly moved for dismissal for failure to prosecute under the Code of Criminal Procedure (§ 668); and renewed the motion at time of trial.
This long delay, despite the readiness of counsel and the willingness of Judges to hear the case, is attributable to the congestion of the criminal trial calendar in Nassau County and the well-founded policy to process indictments in the sequence of their presentment. The total situation, in turn, may reasonably be charged to the rapid growth of the county in population, to the increase in crime, and to the State and community lag in providing additional facilities to process criminal cases — Judges, prosecutors, defense counsel, stenographers, probation officers, court officers and court rooms.
In opposition to the first motion to dismiss, the assistant district attorney stated that “ The Grand Jury of Nassau County is currently handing down 900 indictments per year ”* and in view of the “ tremendous work load ” calendars “ show a delay of up to six months in jail cases and eighteen months in non-jail cases
Therefore, he felt there was “ good cause ” under section 668 of the Code of Criminal Procedure why the indictment should not be dismissed. That such delay is, indeed, caused by calendar congestion is additionally suggested by the newspaper articles made part of appellant’s appendix which show strenuous efforts to cut delay down.
*423 The affirmance of the judgment by the Appellate Division, therefore, must be read as a finding that the delay is not here chargeable to the prosecutor and that it occurred for reasons beyond his control or the control of the court; hence that there was “good cause-” shown under code section 668 for not dismissing the indictment.
But the failure of the State and local governments to provide services and facilities rapidly enough to keep apace with the volume of crime is not a categorically complete answer to the need for prompt trial and practical means must be found in the legal system to minimize undue delay in trial. Both Federal and State judicial agencies are currently addressing themselves to this acute public problem.
On October 17, 1970, Chief Judge Fuld, Chairman of the Administrative Board of the Judicial Conference, announced the board was attempting to eliminate delays in criminal case disposition by recommendation for legislative action and administrative action within the judicial system. The board, as the Chief Judge has added in a supplementary statement, is formulating the imposition of an over-all time limit on criminal trials in State courts and the conditions under which they would be imposed, including the effect to be given to time consumed by pretrial procedures followed by the accused. Such a rule will be promulgated, however, in consultation -with agencies representing both prosecutors and defense counsel.
On January 5, 1971 the United States Court of Appeals for the Second Circuit decided United States ex rel. Frizer v. McMann (437 F. 2d 1312), an appeal in a habeas corpus proceeding addressed to a New York State judgment. The court (per Lumbard, Ch. J.) carefully analyzed the causes of delay in New York prosecutions, but left it to the State to devise procedures to meet Federal prompt trial requirements. On the same day the Circuit Council of that Circuit promulgated rules in pursuance of the United States Code (tit. 28, § 332) requiring the prompt prosecution of Federal criminal cases and fixing applicable time limits.
The imposition of undeviating time tables in criminal cases has the virtue of getting all cases that come into the courts tried or dismissed. To the extent that trial delays are influenced by methods of prosecutors and Judges which they can improve, and *424 the resulting heavy pressure of an absolute time limit causes improvement, some delays will be cut down.
The exact situation is not reflected in available statistics. If there are many dismissals of serious criminal charges because courts and prosecutors have too many cases-to process in spite of full diligence, hopefully public opinion will spur State and local legislative bodies and administrators to provide money for additional services and facilities.
But the court can not look complacently at so Spartan a process leading to so dire a result. The judicial establishment must itself reexamine its own methods of doing things to see if time can be saved in the process, and so accommodation given to more cases in a day’s work.
That Judges are devoting more—not less — effort to the processing of each criminal case than they did 10 years ago is apparent from the official statistics, which will be discussed in a moment, which show in the New York City counties in courts handling felonies a 90% increase in Judge days in processing a 70% increase in indictments. This comparison raises the additional question of how much a further increase in the number of Judges continuing to follow present precedures can alone eliminate trial delays.
Therefore, if we can expedite the movement of cases and minimize delay by improvement of judicial procedures and techniques, we should set about to do it. Some changes may be beyond our power, but what we can do we should do.
Delays in criminal cases are in some part due to time-consuming protective procedures, not directly determinative of guilt or innocence, requiring independent hearings and findings by Trial Judges under current judicial decisions and statutes stemming from these decisions. These decisions have developed in a purpose to provide maximum fairness and constitutional safeguards for the accused; but a point seems to have been reached where their proliferation is a factor in building up calendar congestion..
Some of these hearings now being conducted are reduplicative. The Judge must independently decide the same ultimate fact which the jury also will later independently decide in determining guilt or innocence. *425 The present case is itself a prime example of the reduplicated examination of essentially the same subject, first before the Judge alone, and then before the Judge and jury.
The full trial record occupies 690 pages of transcript. The preliminary hearing before the Judge addressed to reliability of witnesses on identity made a record of 320 pages, almost half the length of the record of the full trial. Defendant concedes that the testimony of those witnesses identifying him as one of the holdup men was very similar at the trial and at the hearing —the witness Nancy Vitale “ substantially ” the same; the witness Vito Scudera "largely the same”. This means that the same testimony was heard before a Judge and then before a Judge and a jury at a time when calendar congestion is growing to dangerous proportions.
To the extent that the 320-page hearing before the Judge alone on identification consumed available court time, it proportionately delayed all cases on the calendar behind the present one. If this happened in a substantial part of the 900 eases in which indictments are returned in a single year, such multiple separate hearings could become a major factor in delay.
The independent decision of the Judge is a necessity, under the rules that have developed to provide constitutional safeguards to accused persons; but in view of the growing crises caused by congested criminal calendars, reduplicated hearings before the Judge, and then before the Judge and the jury, on similar proof, is a procedural luxury.
If the Judge and the jury each can exercise an independent judgment on the same proof, simultaneous presentation should be encouraged. The judicial branch is under a compelling necessity in the light of accumulating experience, of devising and implementing such procedural mechanisms as may be possible and workable to minimize trial delays.
There seem to be no available published statistics on the specific relation between judicial time consumed in collateral hearings in criminal cases—hearings not concerned directly with the guilt or innocence of the accused—and the trial of the cases themselves.
It is, however, a matter of common experience of Judges in criminal courts that collateral inquiries take up substantial *426 blocks of time and have slowed down the final disposition by acquittal or conviction, of the cases themselves.
The available statistics on the criminal courts may reasonably be interpreted as giving support to this experience. The latest complete annual report of the Judicial Conference (N. Y. Legis. Doc., 1970, No. 90, table 12, p. A143) may be compared with the report of 10 years earlier (N. Y. Legis. Doc., 1960, No. 98, table 21, p. 181). Bach covers the judicial year which had concluded the June 30 before the date of report.
Taking the experience in the five counties of the City of New York in the courts then dealing with felonies (the former County Courts and the Court of General Sessions), the report shows that there were 3,717 judicial days expended; that is, that Judges sat that many full days in court. There were 463 completed trials. This meant that the trials each averaged eight days.
The 1970 report shows that in the same counties (the Supreme Court then trying all felonies) there were 6,660 judicial days expended and 507 completed trials. This averages out at 13 days per trial, an increase of about 65% over 10 years earlier.
Of course ‘ ‘ completed trials ’ ’ do not show the full situation because much judicial time is devoted in cases where there was no trial and a great majority of cases are disposed of without trial. But this statistic does indicate reasonably an increase in the time required to process contested criminal cases.
The over-all figures lead to rather consistent inferences. The 1970 report shows 17,471 indictments returned compared with 10,035 in 1960. This represents an increase of 70%. But the increase in judicial days devoted to processing the cases in the respective periods, as it has been noted, was from 3,717 in 1960 to 6,660 in 1970, an increase of about 90%. There are no fully comparable statistics for criminal courts outside the City of New York.
Taken together, these statistics suggest that the additional inquiries now required of Judges, apart from the main trial, consume substantial amounts of time and contribute to the delays in processing criminal cases.
This increase also shows, as it has been noted above, extraordinary efforts by the Judges to dispatch the business in the criminal courts with some 90% more Judge-days devoted to a 70% increase in indictments.
*427 It, therefore, seems desirable to announce the rule that a Trial Judge before whom is sought an independent judicial hearing on the ability of a witness to identify the accused may direct that such proof be taken at the main trial if he affirmatively finds that doing so will not be prejudicial.
If in the course of the main trial he finds the testimony reliable enough to be admitted prima facie he will make that finding out of the presence of the jury and leave the general issue of reliability and credibility to the jury. If he finds the testimony so unreliable as to be inadmissible, on motion of accused he shall direct a mistrial.
If there is such a mistrial there will, of course, be resulting delay in that case; but current experience with independent determinations on pretrial hearings suggest the occasion for mistrial because witnesses have been found judicially so unrealiable that their testimony will not be heard will be rare.
There are other kinds of separate hearings by Judges which are undoubtedly factors in the delay of criminal cases, where the jury independently hears and examines the same question which had just been heard and examined by the Judge. The most important of these is the hearing to determine whether the confession or other admission of the accused made to the police is voluntary.
The present procedure resulted from the implementation in 1965 by this court in People v. Huntley (15 N Y 2d 72) of the decision in Jackson v. Denno (378 U. S. 368) which required a Judge’s decision, independent of a jury’s, of the voluntary nature of a confession, although also leaving that question to the jury.
The procedure outlined in Huntley was codified that year by the Legislature by adding title II-C to the Code of Criminal Procedure (L. 1965, ch. 846) and this expressly provides that the trial “ shall not be commenced until the motion [for the suppression of the confession] has been determined ” (§ 813-h).
Therefore if the evidence on which the Judge makes an independent finding on voluntariness is to be presented as part of the trial, appropriate amendment of the statute must rest in the judgment of the Legislature. If such a statutory change were made it would supersede necessarily too, the procedural sequence *428 outlined in Huntley setting up a preliminary hearing on the issue (p. 78).
Although there is emphasis in Jackson v. Denno (supra) on the separate nature of the determination by Judge and by jury of this question there seems no clear procedural mandate against making these determinations on the same proof. The main concern of the Supreme Court was that there be a separate determination of voluntariness before the jury took the case and that it not be made solely on the jury’s finding, influenced on this question, as it would likely be, by other proof of guilt. There is no suggestion in either Jackson or Huntley that the risk to personal credibility of a defendant choosing to testify at a hearing, but not at the main trial, played any part whatever in the rule laid down.
Much has occurred in the criminal law in the seven years since these landmark cases were decided, and not least of it has been the effect of long delays in which the New York interpretation of Jackson has played a part.
There may be some additional advantage in expediting the progress of cases if the whole inquiry can, without substantial prejudice, be made at the time of the trial, even though some of the proof be taken out of the presence of the jury on questions to be decided preliminarily by the Judge alone. There may be less loss of motion in bringing inquiries related to the case together at the same time.
This may be useful in some instances, for example, in applications to suppress physical evidence under code title II-B. Although these motions must presently be made before the trial (§ 813-d) as a matter of good judicial management it may be practical to hear them at time of trial.
Although the rule announced today with regard to credibility of witnesses is not presently in conflict with the statute, there is a future difficulty in the provisions of the new Criminal Procedure Law (L. 1970, ch. 996) effective next September 1. The new statute expressly requires an inquiry to suppress “ potential testimony ’ ’ in pursuance to a motion made before trial, to be determined before the trial commences (§ 710.40, subd. 3). If the Legislature makes changes in the present general procedure to allow greater judicial flexibility in directing the time of *429 hearings, it may be willing to treat all related procedures similarly.
Consistent with the judicial establishment’s own purpose to eliminate delays resulting from proliferation of hearings and resulting delay in coram nobis proceeding is the contemporary decision of the Appellate Division, Third Department (People v. Ali and Shaw, 35 A D 2d 435) laying down procedure in the department designed to regulate these applications and minimize delay.
It is further argued by appellant that his identification in court was tainted by an unnecessarily suggestive pretrial procedure. But the two witnesses firmly identified defendant even though at the time of the crime he wore sunglasses and a fedora which came down to the top of his glasses. Miss Vitale observed him at the time of this crime for seven minutes; Scudera not only observed defendant, he struggled with him outside the store until the witness was hit on the head by a confederate.
Both witnesses had picked out pictures of defendant from a number shown by police and both identified him in lineups and both also identified defendant in court at a felony examination. Although defendant describes the lineup as a “ show-up ”, the extent to which the lineup, the photographs and in-court presence of defendant on the preliminary examination affected the memory of these two witnesses, who said they could identify defendant, is a question of fact in which the finding has gone against defendant. The witnesses have certainly not been disabled as a matter of law and there is no good ground to reverse here under the cases (People v. Gonzalez, 27 N Y 2d 53; People v. Logan, 25 N Y 2d 184; People v. Rivera, 22 N Y 2d 453; People v. Brown, 20 N Y 2d 238).
The proof is abundant that the car used in this holdup was a black Ford. When this defendant was arrested he was driving a black Ford. The license plate on the car at the scene of the crime was VH 1876. When arrested, license plate 4108 SP was on the car. Appellant argues that proof the VH 1876 plate was issued to a nonexistent person and for a false address was inadmissible, but it was properly received as part of the scheme by the perpetrators of this robbery to elude identity. The false plate was part of the crime even though it *430 might also be a separate offense and this has nothing to do with the “ Molineux rule ” (People v. Molineux, 168 N. Y. 264).
The summation of the prosecutor complained of was responsive both to a line of cross-examination and of argument pursued by defendant.
The judgment should be affirmed.

 The District Attorney has stated, after the decision was published, that the affidavit mistakenly understated the number of indictments, which was 1,542 in 1968.