296 A.2d 19.

HOWARD WARREN TATE *vs.* FRANCIS A. HOWARD, *Warden et al.*

OCTOBER 31, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

642

KELLEHER, J.   In this petition for habeas corpus, Howard Warren Tate charges that he is being unlawfully detained at the Adult Correctional Institutions because he has been denied both his constitutional right to a speedy trial on an indictment charging him with rape and a fair hearing on whether he had violated the terms of a deferred sentence agreement.   This is the second time this year that Tate has been before us.   Earlier, we denied and dismissed his bill of exceptions stemming from a Superior Court jury trial culminating in his conviction of the rape charge.   *State* v. *Tate,* 109 R. I. 586, 288 A.2d 494 (1972).

The record discloses that on May 13, 1969, Tate appeared in the Superior Court for Kent County and pleaded guilty to an indictment which charged him with breaking and entering. He was given a deferred sentence. Approximately three months later, he and several others were arrested and charged with having participated in what might be described as a gang rape of a 16-year-old girl. The assault occurred at a "cook-out" which took place on one of the many beaches that populate the Warwick shore. Tate and his girl friend had attended the cook-out as did the prosecutrix. She had come to the party with her girl friend and three other males.[1] The rape charge led to Tate's being returned to the Superior Court as a violator of the deferred sentence. When he appeared for the violation hearing, Tate's private counsel asked that he be released on bail until the District Court held a probable cause hearing on whether the rape charge should be referred to the Kent County Grand Jury. The Superior Court justice was amenable to this suggestion and Tate was released on bail pending a determination of probable cause by the District Court. The Public Defender's office was representing Tate on the rape charge.

Subsequently, the District Court found probable cause. The Grand Jury returned the rape indictment on December 6, 1969. Tate pleaded not guilty to this charge on Decem-

---

[1]At the time of the beach party, Tate was 20 years of age. Two of our recent appeals are related to this incident. They are *State* v. *Bruyere,* 110 R. I. 426, 293 A.2d 311 (1972), and *In re McCloud,* 110 R. I. 431, 293 A.2d 512 (1972). Bruyere was given a new trial because of the trial justice's prejudicial charge. McCloud, who was one of the prosecutrix's escorts, was a juvenile. He was awarded a jury trial in the Family Court. We reversed and ruled that a juvenile charged with delinquency did not have any constitutional or statutory right to a jury trial. A check of the records of the Superior Court for Kent County shows that in addition to Tate and Bruyere, three other partygoers were indicted. One was acquitted, the second who was convicted has taken an appeal, while the third is yet to be tried.

ber 11, 1969. Six days later, he was back in the Superior Court as an assistant Attorney General asked that a three-year sentence be imposed upon him for the breaking and entering episode. Tate asked that he be given a hearing on his deferred sentence status but ·the trial justice referred to petitioner's earlier brushes with the law and then said that Tate was entitled to no more than one hearing and that he had it in the District Court.

Tate was then sentenced to serve 34 months.[2] He has been incarcerated since that time.

Earlier, in February, 1970, Tate began to bombard the various state agencies who were or should be concerned with his confinement and the disposition of the rape charge. He was demanding that he be brought to trial. His correspondence went to the Attorney General's office. It in turn referred Tate to the Public Defender's office. In mid-February, he wrote to the Public Defender and pointed out that he had not heard from the assistant Public Defender who had been assigned to him. Throughout his correspondence, petitioner constantly expressed concern with the dispatch with which his case was moving. In mid-June, 1970, he wrote to the Public Defender and once again asked that his counsel confer with him as a prompt trial of his case would be in his best interest. On June 19, 1970, he filed a pro se motion for a speedy trial in which he referred to the possible loss of witnesses and the apparent lack of effort by either the prosecution or the Public Defender's office to try the pending indictment.

In the latter part of July, 1970, petitioner filed a motion to dismiss the indictment because of the state's failure to grant him a speedy trial. He attached to the motion a newspaper clipping announcing the forthcoming marriage of the prosecutrix. Tate alleged that this event would amount to

---

[2]He was credited with the two months he had spent in jail waiting for a hearing on the violation of the 1969 deferred sentence.

another roadblock in his efforts to be tried. He also en-closed a letter from a friend who had testified for Tate at the probable cause hearing. In this letter, petitioner's friend commented that the lapse of time had dulled his memory and he would not be able to testify.

Tate asked for the appointment of counsel other than a member of the Public Defender's staff.[3] Finally, on July 20, 1970, a staff attorney contacted Tate and told him that since the Superior Court for Kent County was closed for the summer, it would be impossible to schedule a trial prior to the beginning of the court's fall session, which would occur sometime near mid-September, 1970.

The motion to dismiss was heard on September 17, 1970. When the trial justice inquired as to the reason for the de-lay in trial, he was informed that five individuals had all been charged with raping the prosecutrix. The assistant Attorney General who was handling the criminal calendar told the court that, given enough time to bring the prosecu-trix back to Rhode Island, Tate's case could be tried on any given day. Trial was scheduled for October 5, 1970. When Tate inquired if there was a guarantee that his case would go on that day, the trial justice remarked that he could make no promises, especially since there was a possibility that the state might move to consolidate the pending in-dictments for trial but went on to say that he would deny the motion before him "* * * on condition, however, that the State try the case not later than October 5, 1970." The judge presiding at the fall session assured defense counsel that, if the case was not tried on that date, he would enter-tain a motion to dismiss. The assistant Attorney General assured the court that the prosecution would be ready. The

[3]We have, because of Tate's dissatisfaction with the services provided by the Public Defender's office, appointed appellate counsel whose efforts in this cause have been in keeping with the highest and best tradition of the bar.

petitioner left the courthouse in a much better frame of mind than when he had arrived.

October 5 came and went. There was no trial. Twelve days later, a motion to dismiss was once again filed. It alleged that another case was tried on that day because of the state's decision to try what it considered to be a more important matter. Tate returned to jail and resumed his literary efforts. He wrote to various justices of the Superior Court asking that he be tried. The record does show a habeas was issued on November 18, 1970, but Tate was not brought to court.

Another habeas was issued on December 10, 1970, and Tate appeared with his counsel before the same justice who had earlier suggested the filing of the motion to dismiss. The justice retreated from his earlier conditional promise to dismiss the indictment. His reason was that, when Tate appeared earlier, he thought Tate's awaiting-trial status was due solely to his inability to make bail and not because he was then serving a three-year sentence. The trial justice remarked as to the large number of criminal cases awaiting to be heard in Kent County and suggested that even though Tate had a right to be tried in that locality, there was a good possibility that, if he consented to the change of venue, he could be tried in January, 1971 in the Superior Court for Providence and Bristol Counties. When petitioner gave a negative reply to this suggestion, his motion to dismiss was denied.

Tate continued to file petitions for habeas corpus. One was filed during December, 1970 in the Superior Court. Two were filed with us. One arrived in February, 1971; the next came one month later. Before any action could be taken on either petition, Tate found himself back in the Kent County Courthouse for a trial. It was now March 1, 1971.

The record shows that the assistant Public Defender was

about ten minutes late in arriving at the courthouse. When the case was called, Tate's counsel asked that the case be passed because Tate, in full view of the prospective jurors, had been led into the courtroom handcuffed to a member of the committing squad. At one point after defense counsel had insisted that his client's case had been prejudiced, the trial justice, in what might be described as an unfortunate departure from acceptable judicial temperament, excoriated the Public Defender and told him to withdraw his appearance because "you are not fit to represent this man." The attorney was told that he was not to appear before the court for the balance of the session. Tate, who was present as his attorney was being dressed down, once again left the courthouse after another fruitless attempt to be tried.

The trial was held in April, 1971. Tate's friend did not testify. The jury's verdict was affirmed by the trial justice who thereupon imposed a ten-year sentence upon petitioner. The sentence called for five years of the sentence to be served, at least in part, concurrently with the breaking and entering sentence with execution of the remaining five years suspended during a five-year probation period which would commence once Tate had completed the first five years.

The right of an accused to a speedy trial is guaranteed by the Declaration of Rights of the Rhode Island constitution, art. I, sec. 10 and by the Sixth Amendment of the Constitution of the United States made applicable to the states pursuant to the Fourteenth Amendment. *Orabona v. Linscott,* 49 R. I. 443, 144 A. 52 (1928); *Klopfer v. North Carolina,* 386 U. S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967). In seeking to determine if Tate's speedy-trial right has been violated, we need only to look at the most recent pronouncement made by the Supreme Court in *Barker v. Wingo,* 407 U. S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

The Court first pointed out that it is impossible to determine with precision when this right has been denied. It refused either to specify any set period of time during which the accused must be offered a trial or to endorse the so-called "demand rule" which holds that the Sixth Amendment applies only to those who have demanded a speedy trial.[4]

In the *Barker* case, Mr. Justice Powell observed that the right to a speedy trial is a relative one and the determination of the time within which trial must be had to satisfy the guarantee to defendant being dependent upon the facts and circumstances of each particular case with due consideration given to the following four elements:

1. Length of delay.
2. Reason for the delay.
3. Assertion of one's Sixth Amendment right.
4. Prejudice to the accused.

With *Barker* as our guide, we turn to the instant petition.

### Length of Delay

The first element needs no lengthy consideration. As noted before, there was a 16-month interval between the return of the indictment and the commencement of trial.[5]

---

[4]Although in *Ramsdell v. Langlois,* 100 R. I. 468, 217 A.2d 83 (1966), we reiterated the past support given by this court to the view that the right to a speedy trial is waived unless the accused makes a demand, we pointed to *People v. Prosser,* 309 N. Y. 353, 130 N.E.2d 891 (1955), which holds that no demand is necessary and charges the state with the burden of giving the accused a trial in due course. We emphasized that if Ramsdell had raised the validity of the demand rule, we might have changed the rule in this jurisdiction.

[5]The passage of time, standing alone, does not justify a holding that the guarantee to a speedy trial has been violated. *United States v. Daley,* 454 F.2d 505 (1st Cir. 1972). This same court described a nine-month delay as being "overly long." *United States v. Butler,* 426 F.2d 1275 (1st Cir. 1970).

## Reason for the Delay

When we seek the cause of the 16-month delay we look first to comments made by the assistant Public Defender as he argued Tate's motion to dismiss the indictment in mid-September, 1970. The Public Defender told the court that he was assigned to try cases in Kent and Washington Counties. He stated that the Superior Court should be open for the trial of criminal cases on a year-round basis. He was critical of the Kent County system because he claimed that the short period of time allotted to the trial of pending criminal cases made it almost impossible to have two consecutive lengthy trials. Later, when he returned to Kent County on October 5, 1970, Tate's counsel emphasized that the rape case did not go to trial because the Attorney General decided to try another case on that date.

The justice assigned to preside over the Kent County calendar, in endorsing a portion of counsel's remarks, recommended the abolition of the system where trials have to be conducted in the county where the offense occurred.

When Tate returned to the Kent County Courthouse in December, 1970, this justice declared, "I am going to say for the record we have a crisis in Kent County Superior Court." He spoke of the tremendous backlog of cases and the attorneys who are "screaming for trials." He informed all present that he was the only judge available to handle the calendar. The lack of adequate courtroom space was highlighted by the justice's announcement that the Family Court would soon inaugurate its Kent County session and the Superior Court would be forced to vacate the premises.

The assistant Attorney General also spoke of the difficulties brought on by crowded dockets, limited courtroom space and the tight time schedule which confronted his department.

Part of the delay in arriving at an earlier trial date can be attributed to the actions of the justice in charge of the Kent County calendar. When in December, 1970 he told Tate that the court was mistaken as to his status at the Adult Correctional Institutions, the justice apparently overlooked the language of the Sixth Amendment and its Rhode Island counterpart. They both guarantee every "accused" of a right to a speedy trial, and a convict is not excepted from its provisions. *In re Mugica,* 69 Cal.2d 516, 446 P.2d 525, 72 Cal. Rptr. 645 (1968). A man imprisoned on a charge totally unrelated to a pending indictment is entitled to a prompt trial on the charge set out in the indictment. *People* v. *Ganci,* 27 N.Y.2d 418, 318 N.Y.S.2d 484, 267 N.E.2d 263 (1971). Accordingly, there was no justification for the postponement of Tate's trial simply because he was already serving a three-year term.

Further, when the case came on again in March, 1971, the motion to pass the case was originally denied. There then followed a colloquy during which a member of the Attorney General's staff suggested that any prejudice caused by the handcuffing could be removed by proper cautionary instructions. Whatever chance that the case would proceed to trial went by the boards when the trial justice in his momentary pique made remarks which, if they were to be said at all, might have been better directed to counsel in the privacy of the justice's chambers rather than in open court. Although the justice's anger can be said to be an understandable manifestation of the frustration felt by the conscientious judge in his attempt to dispose of matters pending on the trial calendar in an orderly and expeditious fashion, the adverse comment about the Public Defender's ability to represent Tate prompted his trial attorney to ask that he be excused, particularly in the light of the "serious charge" pending against his client.

The October 5, 1970 action of the Attorney General[6] in trying a case other than Tate's indictment further stymied petitioner's efforts to have his guilt or innocence determined. This preempting of Tate's tentative trial date gives us the opportunity to put at rest the longtime belief held by many that the Attorney General has absolute control of the criminal calendars of this state's trial courts. This impression stems from certain language found in *Orabona v. Linscott, supra,* which was a habeas corpus proceeding where Orabona, who had been jailed as a deferred sentence violator, argued that the Attorney General had no authority to enter into an agreement with him which stipulated that sentencing on an assault charge would be deferred so long as Orabona behaved himself. The court, in rejecting this contention, referred to the Attorney General's constitutional responsibility to enforce the criminal law and embellished this observation by making the entirely gratuitous remark that this member of the executive branch of our government had control of his docket for the trial of criminal cases.

However, the court's reference to the prosecution's control of the docket was based on its reliance on *State v. Silvius,* 22 R. I. 322, 47 A. 888 (1900). An examination of *Silvius* shows that there the defendant had been charged in three separate indictments with various infractions concerning the sale of liquor. All three indictments had been assigned to the same day and Silvius had been notified of the assignments. The trial justice allowed the state to try the third indictment over the objections of Silvius. On appeal this court said:

---

[6]We wish to stress our concern that nothing we say herein should be considered as an adverse reflection upon the incumbents holding the offices of Attorney General and Public Defender. The shortcomings to which we allude were present long before they assumed office. In fact, we are cognizant of the efforts made by both these individuals to improve a system which is in dire need of an overhaul.

"Under the long and well-settled practice in this State, the attorney-general has control of his docket, and *after* it has been set down for trial and due notice thereof given, he may try the cases in such order as he sees fit." (emphasis ours)

The most control vested in the Attorney General by the holding in *Silvius* and repeated in *Orabona* is that if two or more indictments pending against an accused are assigned on the same day, all things being equal, the prosecutor can choose which indictment he shall try first. The court in *Silvius* pointed to the defendant's failure to show any cause whereby the prosecution should not be able to select the indictment it desired to try.

The myth of the Attorney General's unbridled calendar control was somewhat dispelled in *Palmigiano* v. *Affleck*, 327 F. Supp. 1280 (D. R. I. 1971), where the three-judge court sitting in the United States District Court for the District of Rhode Island highlighted one limitation on this supposed absolute power by repeating the following excerpt:

"His [the Attorney General's] control of the prosecution, of course, is regulated by the constitutional provision (Art. 1, Sec. 10) that the accused shall have a right to a speedy and public trial, and by Gen. Laws 1923, C. 407, §57, [now §12-13-7][7] that every person indicted for murder and certain other felonies and imprisoned under the indictment shall be tried or bailed within six months after he shall plead to such indictment, if he demand a trial, unless such delay is unavoidable." 49 R. I. at 445, 144 A. at 53.

A decade before *Orabona* appeared, this court ruled that the Superior Court's jurisdiction to hear indictable offenses gave that court the inherent power to determine when

---

[7] Under this section, an accused can be bailed even though he had been previously denied bail after a so-called Taglianetti hearing because the state has presented evidence of his guilt. *Marzilli* v. *Howard*, 108 R. I. 309, 274 A.2d 902 (1971).

such trials would be held. *Deslovers* v. *Superior Court,* 40 R. I. 246, 100 A. 399 (1917). Moreover, in *State* v. *Genereux,* 95 R. I. 292, 186 A.2d 738 (1962), it was said that the assignment of a case for trial is largely a matter of administration which rests in the discretion of the Superior Court. In other words, while we have recognized the Attorney General's power to conduct prosecutions on behalf of the state, once criminal process is issued either by way of complaint or indictment, his power is subject to both the judiciary's right and power to provide for an orderly administration of criminal justice within the judicial system and its obligation to protect an accused's right to due process and speedy trial. *Lumsden* v. *State,* 267 A.2d 649 (Me. 1970); *Commonwealth* v. *DiPasquale,* 431 Pa. 536, 246 A.2d 430 (1968).

Tate's efforts to get his case off the launching pad provide a further insight as to the difficulties he encountered. The State of Rhode Island provided him, because he was indigent, with the services found in the office of the Public Defender. This office, like the Attorney General's Department, has performed in yeomanlike fashion before the courts of this state for many years. There is one hitch, however, and it is that the assistant Public Defenders hold part-time positions.[8] Their salaries are such that they must carry on a private practice. The assistant who was assigned to Tate did not enter his appearance in the rape case until mid-June, 1970—six months after the Grand Jury had returned the indictment. We cannot fault the assistant. Like his fellow assistants, he is overworked and underpaid. In these days when the cost of living seems destined to hit astronomical heights, he cannot afford to work full time in the Public Defender's office.

---

[8]The Public Defender is required by §12-15-3 to devote his full time to the duties of his office.

An accused gains little solace from being told of the "crisis" caused by crowded dockets, inadequate facilities, lack of judges and part-time help. His constitutional right to have his fate determined without unreasonable delay does not revert to a state of suspension when the Superior Court shuts down during the sultry months of July and August.

Even though we have stressed Tate's right to a speedy trial, we cannot ignore the public's right that the charging authority insure the expeditious trial of criminal cases so that there will be some assurance that witnesses are available to testify as to what transpired. *Dickey* v. *Florida*, 398 U. S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); *Commonwealth* v. *Scott*, Mass., 277 N.E.2d 483 (1971). Lengthy pretrial detention is costly, contributes to the overcrowding of penal institutions and can cause violence to erupt within the prison population.

Having in mind the mutuality of interest in affording prompt trials, the state, if it indicts a person, must be prepared to give him a trial without any unnecessary delay. The satisfaction of this obligation requires a cooperative effort between the three branches of government. If criminal trials are to be held during the summer, the necessary air conditioning equipment must be acquired so that all the participants, including the jury, can perform their tasks in relative comfort. The migration to suburban areas such as Kent County demands that steps be taken to insure the availability of adequate courtroom space and either additional judges or the more efficient use of the judicial manpower presently available.[9] Adequate salaries for prosecu-

---

[9]One of the referenda to be voted upon in the forthcoming general election is a proposal calling for a bond issue, the proceeds of which will be used to build new courthouses at different locations. In the January, 1972, session of the General Assembly the Senate passed S-3583. This bill called for the complete interchangeability of the trial judges of the

tion and public defenders will contribute to a more efficient system. The time for the wringing of hands is over. It is time that positive steps be taken so that one's right to a speedy trial will be viable 365 days in the year and in all parts of Rhode Island.

The blame for the delay experienced by Tate rests at the feet of the state.

In coming to this conclusion, we are aware of the state's contention that Tate cannot be considered blameless in this situation because of his unwillingness to have his case transferred from Kent to Providence County. We would first emphasize that although the accused has a constitutional right to a speedy trial, G. L. 1956 (1969 Reenactment) §12-17-11 gives him the right, if it be alleged that the crime was committed in Kent, Newport or Washington County, to be tried in that particular county. Additionally, it should be kept in mind that a few seconds before Tate was asked to waive his statutory right of venue, he had just lost his constitutional status as an "accused" because of the trial justice's mistaken belief that the constitutional right to a speedy trial did not apply to a prisoner serving a sentence for another crime. Finally, having in mind the state of the administration of criminal justice in this jurisdiction in December, 1970, there was no guarantee that Tate's case would be reached any quicker in Providence than in Kent County.

---

Superior, Family and District Courts serving in the Counties of Kent, Newport and Washington during a one-year experimentation period. This legislation, which had been sponsored by a joint bench-bar committee, envisioned a flexibility in the use of all the trial judges and other court personnel whereby a concerted effort could be made to reduce the backlog referred to by the judge when he told Tate about the "crisis" in Kent County. When the Legislature adjourned, the bill was still in committee.

### Assertion of Tate's Sixth Amendment Right
### and
### .Prejudice to the Accused

We have combined the last two elements which are pertinent to Tate's alleged denial of a speedy trial.

It is clear that Tate was figuratively banging on the courthouse doors asking that he be heard almost from the beginning of 1970. He demanded and redemanded that he be brought to trial. The delay and frustrations he experienced have prejudiced him in a way that is real and substantial. Tate's companion, at the time of the alleged rape, testified in petitioner's behalf at the probable cause hearing held in the District Court. He was not available for the Superior Court trial where the state had to prove not probable cause but guilt beyond a reasonable doubt. The friend's testimony could have tipped the scales in Tate's favor.

The 16-month delay hurt Tate in another way. Because of the pendency of the rape charge, Tate was denied the privileges usually assured an inmate serving a sentence at the Adult Correctional Institutions. Since prison officials classified Tate as being in an awaiting-trial status, petitioner was not eligible to participate in the work release program. He was incarcerated in the maximum rather than the minimum security area of the prison. Finally, petitioner could not, because of his inability to be tried, be considered for parole on the three-year sentence he was then serving. It is obvious, therefore, that he was denied the benefits which are designed to rehabilitate rather than punish the prison inmate.

When we measure Tate's travails against the criteria set out in *Barker,* the answer we reach comes in clear unmistakable tones. Tate has been denied his constitutional right to a speedy trial!

## The Deferred Sentence Hearing

Tate has alleged that he was denied meaningful assistance of counsel in December, 1969 when another justice of the Superior Court denied his request for a hearing on whether he had violated the terms of the deferred sentence agreement which grew out of the breaking and entering episode.[10] It is true, of course, that since *O'Neill* v. *Sharkey*, 107 R. I. 524, 268 A.2d 720 (1970), a probationer, while not given all the due process requirements guaranteed for a strict or formal trial, is entitled to counsel, be heard in his own defense and question any witnesses who may testify at the hearing concerning his alleged violation of the terms of probation. However, we emphasized in *O'Neill* that the standards promulgated therein were to be applied prospectively. Consequently, Tate's fate is to be determined by the holding in *Walker* v. *Langlois*, 104 R. I. 274, 243 A.2d 733 (1968), where we said that an accused probation violator should be given an opportunity to "explain away" his alleged misbehavior. The record shows that Tate was not permitted to utter one word. He was told that he had all the hearing he was to have when he appeared before the District Court on the issue of probable cause. The sentencing justice's sole reliance on what transpired in the District Court completely dissolved Tate's right to the procedural due process to which he was then entitled.

The petition for habeas corpus is granted. The respondent is directed to release the petitioner from custody insofar as Tate's detention is related to the sentence imposed because of the rape conviction. Tate is to be brought forthwith before the Superior Court at which time he can be heard on his status as a deferred sentence violator.

---

[10]*Charest* v. *Howard*, 109 R. I. 360, 285 A.2d 381 (1972), provides that in the future all appellate reviews of probation revocation hearings will be by way of a bill of exceptions rather than habeas. Tate's petition was filed long before *Charest* was published.

**658**

Motion of state to reargue denied.

*Amedeo C. Merolla,* for petitioner.

*Richard J. Israel,* Attorney General, *Donald P. Ryan,* Assistant Attorney General, *R. Raymond Greco,* Special Assistant Attorney General, for respondent.