STATE

v.

Arthur FORTIER.

No. 78–136–C.A.

Supreme Court of Rhode Island.

April 8, 1981.

Dennis J. Roberts, II, Atty. Gen., Michael R. Stone, Sp. Asst. Atty. Gen., for plaintiff.

Barbara Hurst and Mary E. Levesque, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

The defendant, Arthur Fortier (Fortier), was indicted by a Providence County grand jury on one count of embezzlement[1] and on another count of uttering and publishing a forged instrument.[2] Fortier's pretrial motion to dismiss the second count was granted by a trial justice of the Superior Court. The matter proceeded to trial on the embezzlement count and the jury returned a guilty verdict. Fortier is now before us on appeal from the judgment of conviction.

Certain facts involved in this appeal are not in dispute. From 1970 to 1975 Fortier was employed by the state as a probation officer in the Division of Probation and Parole. At that time, the duties of probation officers included the collection and disbursement of funds received from probationers who were subject to court orders to pay restitution and court costs.[3] It was not unusual, in the execution of this function, for probation officers to accept personal checks from probationers payable to the order of the probation officer. Upon receipt of the checks, the probation officer would then make the appropriate disbursements.

In 1975, the Bureau of Audits conducted a routine audit of the accounts of all probation officers in the department. The auditors found many discrepancies to exist among these accounts. These discrepancies were in large part attributed to the probation officers' lack of formal training in accounting and bookkeeping procedures.

With respect to Fortier's accounts, the audit focused in particular upon accounts he

1. In violation of G.L.1956 (1969 Reenactment) § 11–41–3.

2. In violation of G.L.1956 (1969 Reenactment) § 11–17–1.

3. The function of collecting and disbursing restitution and court costs has since changed. In 1974 the Central Registry of the Division of Probation and Parole assumed this function.

kept on behalf of two probationers, Donald William Simonetti (Simonetti) and Steven Reynolds (Reynolds). Simonetti testified that in 1972 he pleaded nolo contendere to a charge of embezzling $16,900 from his employer. As a result of this plea he received a five-year suspended sentence and was placed on probation for five years. Simonetti was also ordered, as a result of his plea, to make restitution to his employer. Fortier was assigned as Simonetti's probation officer. It was, as mentioned above, among Fortier's duties as probation officer to collect and disburse the monies Simonetti had been ordered to pay as restitution. Simonetti and Fortier agreed that Simonetti would make the checks out to Fortier personally. Simonetti comported himself with the terms of this agreement until the duty of collection and disbursement of funds was assumed by the central registry. (See footnote 3.) A series of personal and bank checks drawn on Simonetti's account was introduced into evidence.[4] The thrust of the prosecution's evidence, elicited through a variety of witnesses including Simonetti and state auditors, was to show that Fortier received $1,261.50 from Simonetti but that only $711.50 was recorded in Fortier's account books.

An analogous situation existed in respect to Reynolds. It appears from the record that Reynolds was charged with uttering and publishing a check, and on February 27, 1973, he appeared before a justice of the Superior Court. The justice placed Reynolds on probation and ordered him to pay $55.42, the amount of the uttered and forged check, in restitution. Fortier was assigned as Reynolds' probation officer, and apparently arrangements for payment similar to those made between Fortier and Simonetti were made between Fortier and Reynolds. The evidence adduced at trial indicated that Reynolds paid his restitution within the time ordered by the justice before whom he appeared; however, the auditor found no evidence to indicate that Fortier had entered these payments into his account books.

The state sought to prove that these discrepancies resulted from Fortier's conversion of the missing funds to his own use. Fortier contends that the discrepancy resulted from his lack of sophistication in bookkeeping procedures.

At the outset, however, Fortier contends that his conviction must be reversed because he was denied his constitutional right to a speedy trial as is guaranteed by the Sixth Amendment to the United States Constitution and art. I, sec. 10 of the Rhode Island Constitution.

In order to assess fully the merits of defendant's contentions in this regard, a brief review of the travel of the case is in order. On April 9, 1976, a Providence County grand jury returned the two-count indictment against defendant. At his arraignment on April 19, 1976, defendant pleaded not guilty and was released on personal recognizance. The defendant's counsel filed a motion for a bill of particulars and a motion for discovery and inspection on May 5, 1976; and on August 3, 1976, defendant's counsel moved for a speedy trial. On October 22, 1976, the state filed its answers to defendant's motions for a bill of particulars and discovery and filed its own request for discovery. After defendant allowed several months to elapse without answering the state's request for discovery, the state filed a motion to compel defendant's answers. The motion was filed on February 23, 1977, and defendant complied with this request by filing his answers two days later. On May 9, 1977, defendant moved to have his case placed on the summer 1977 calendar. This request was granted and the matter was set down for trial on August 19, 1977. On August 22, 1977, the state moved for a continuance and defendant moved to dismiss the case for lack of a speedy trial. A judge of the Superior Court granted the state's request for a continuance and denied defendant's motion to dis-

---

4. Simonetti testified that beginning on November 23, 1973, he started drawing bank checks instead of personal checks because he found that the use of personal checks resulted in an overabundance of outstanding checks on his monthly statement.

miss. The case was reached for trial again on September 28, 1977, but this time defense counsel moved for a continuance. The same scenario was repeated the next day. For reasons not apparent from the record, when the case was again reached on September 30, 1977, defense counsel made a motion to pass the case. The motion was granted, and defendant's trial commenced on October 18, 1977.

█ The right to a speedy trial is a fundamental one, and it applies to the states through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).[5] However, it has been said that it is "impossible to determine with precision when the right has been denied." *Barker v. Wingo*, 407 U.S. 514, 521, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101, 112 (1972), and that "there is no fixed point in the criminal process when the State can put the defendant to the choice of either exercising or waiving the right to a speedy trial." *Id.* at 521, 92 S.Ct. at 2187, 33 L.Ed.2d at 112.

█ Because of the amorphous quality of this right, the Supreme Court in *Barker* enumerated four factors that should be considered whenever a defendant contends he has been denied a speedy trial. They are the length of the delay, the reason for the delay, the defendant's assertion of this right, and prejudice to the defendant. Although none of these factors, alone, was intended to be "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial," *Barker v. Wingo*, 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118, this court has adopted these factors as guidelines in determining whether an accused's constitutional right to a speedy trial has been violated. *Tate v. Howard*,

110 R.I. 641, 296 A.2d 19 (1972). We will, therefore, analyze the facts of this case utilizing these guidelines.

## LENGTH OF DELAY

As stated above, Fortier was indicted on April 9, 1976, but his trial did not commence until October 18, 1977. Thus a period of over eighteen months elapsed between the time of the indictment and the time of the trial; however, not all of this delay is fairly attributable to the state. The record shows that the state filed its request for discovery on October 22, 1976, yet it did not receive answers to this discovery until February 25, 1977, nearly four months later.[6] The record also shows that on both September 28 and 29, 1977, defendant moved for and was granted continuances. On September 30, at defendant's request, the case was passed; therefore, this latter period from September 28 until the commencement of the trial should not be charged to the state.

█ The point we are making is not that the delay attributable to defendant renders it unnecessary for us to evaluate the other factors.[7] Rather our point is that a court should not allow defendants to count, for purposes of this first factor, periods of time in which defendants fail to timely comply with the state's request for discovery and thereby profit from their own dilatory tactics.

## REASON FOR DELAY

As discussed above, defendant requested a speedy trial on August 3, 1976. Thereafter, on October 22, 1976, the state filed its motion for discovery, which defendant did not answer until February 25, 1977. Thus, the reasons for this four-month delay, whatever they were, are not attributable to

---

**5.** Although the gravamen of this right is to protect the accused, there are other societal interests that are safeguarded by the constitutional requirement of a speedy trial. *See Barker v. Wingo*, 407 U.S. 514, 519–21, 92 S.Ct. 2182, 2187, 33 L.Ed.2d 101, 112 (1972).

**6.** The state found it necessary to move to compel defendant's answers. The motion was filed February 23, 1977.

**7.** For at any rate, the period would still be thirteen or fourteen months. Such period is enough, without more, to trigger inquiry into the other three areas mentioned above. *See United States v. Jones*, 524 F.2d 834 (D.C.Cir. 1975) (thirteen months); *Tate v. Howard*, 110 R.I. 641, 296 A.2d 19 (1972) (sixteen months).

**1322**

the state. On May 9, 1977, defendant moved to have his case placed on the summer calendar. The motion was granted and the trial was scheduled for August 19, 1977.

We note that not once during the period from August 3, 1976, until August 22, 1977, when the case was reached, did defendant reassert his right to a speedy trial. It was he who, in May, requested that the matter be heard in the summer. Thus, the only delay that is fairly chargeable to the state is that resulting from its request on August 22, 1977, for a continuance.

■ The reason given by the state for its request for a continuance is that it was unable to locate a material witness—Reynolds. Although defendant contends that the state did not exercise due diligence in its effort to locate Reynolds before the trial, we cannot say that the state's alleged lack of effort in locating Reynolds was of such a magnitude as to deprive defendant of his constitutional rights.

It appears from the record that the prosecutor contacted the State Police at least twice before the date of the trial and asked them to ensure Reynolds's availability for trial. The first time was shortly after the summer trial calendar was published. At that time, the State Police investigator told the prosecutor that there was no reason that the state would not be prepared for trial. The second contact occurred about one week before trial. The prosecutor also contacted Reynolds's father, but the latter was unaware of his son's whereabouts. After learning this, the prosecutor asked the father to attempt to locate his son and to have him contact his office when he did locate him.

■ In *Barker*, the Supreme Court specifically stated, in reference to the reasons given for the delay, "a valid reason, such as a missing witness, should serve to justify an appropriate delay." *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. In granting the state's request, the trial justice stated, "This case should be assigned for trial within one month from

today * * *." Although the next hearing date was held several days later than a month subsequent to this, we hold that such a delay was appropriate under the circumstances.

There is nothing in the record to indicate that the prosecutor deliberately delayed in order to hamper the defense, and, in fact, defendant concedes that he did not do so. In light of the foregoing, we conclude there were justifiable reasons for delay.

### ASSERTION OF THE RIGHT

Between August 3, 1976, when defendant requested a speedy trial, and August 22, 1977, when defendant moved to dismiss for the lack of a speedy trial, defendant did nothing in the way of demanding a speedy trial. Although in May of 1977 he did ask to have his case placed on the summer trial calendar, such a request is not tantamount to a demand for a speedy trial. During this time defendant was not "knocking at the courthouse door."

### PREJUDICE

■ In *Barker* the court identified three interests that the speedy trial right was designed to protect. These interests are (1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern of the accused, and (3) to limit the possibility that the defense would be hampered. *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118.

■ In this case, we may summarily dispose of two of these factors. The defendant, having been released on personal recognizance, was not incarcerated prior to trial, nor does it appear from the record that his defense was in any way impaired by the delay. Although defendant proceeded to trial with an attorney other than the one who began the case and was responsible for it for over one year, it is not apparent from the record, nor does defendant seriously contend, that his defense was impaired because of this change.[8]

**8.** Joseph L. De Caporale, Jr., the attorney who initially undertook Fortier's defense, indicated

to the trial justice, at the motion for continuance, that he would be leaving the Public De-

Similarly, the remaining interest, that of minimizing the defendant's anxiety and concern, was not violated by the delay. The defendant's counsel suggested during his motion to dismiss that defendant lost both his job and his family as a result of the delay. The defendant's own testimony does not indicate that his entire family abandoned him, rather that he and his wife separated. He further testified that he secured other employment, albeit not of the same nature as his previous employment.[9] We are aware that someone in defendant's position is subject to greater than usual social and economic ostracism; nevertheless, we agree with the trial justice that defendant was subjected only to the "general prejudice which any defendant suffers when he is charged with a crime."

We are unable to conclude in light of the record before us that defendant was deprived of his federal and state constitutional rights to a speedy trial.

## II

The defendant next contends that the trial justice abused his discretion in granting the state's motion for a continuance and in denying his motion to dismiss. In support of his argument, defendant cites Rule 48(b) of the Superior Court Rules of Criminal Procedure which provides in pertinent part:

"(a) * * *

"(b) By Court. If there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information, or complaint."

■■■ We note here that a motion made pursuant to this rule is addressed to the sound judicial discretion of the trial justice and therefore we will only set aside a ruling thereunder whenever the trial justice has clearly abused his discretion. *State v. Gro-*

*ver*, 112 R.I. 649, 652, 314 A.2d 138, 139 (1974). In analyzing whether there was a clear abuse of discretion, we need look no further than *State v. Paquette*, 117 R.I. 505, 368 A.2d 566 (1977). There, we stated that

"in ruling on a motion to dismiss under this rule, the only element for consideration is whether the delay was unnecessary. The defendant need not make a showing of prejudice, nor must he assert his right to a prompt trial; once the defendant shows that none of the delay in question is attributable to him, he has established a prima facie case of unnecessary delay, and the burden of showing justification for the delay is shifted to the state." *Id.* at 511, 368 A.2d at 569.

■■■ In the instant case, defendant did not establish a prima facie case of unnecessary delay because he failed to show, as discussed above, that none of the delay was attributable to him. The defendant also conceded that the alleged dilatory conduct was not contrived by the prosecution for the purpose of harassment and of preventing him from preparing a competent defense. Thus we find no abuse of discretion in the trial justice's denial of defendant's motion to dismiss.

■■■ Similarly, the trial justice did not abuse his discretion in granting the state's request for a continuance. The fact that the state proceeded to trial without Reynolds as a witness does not necessarily show, as defendant would have us believe, that his testimony would not have been material. It is clear that at the time the prosecutor moved for the continuance, he had reason to believe that Reynolds's testimony would be material. He believed then that the discrepancy in the Simonetti account amounted only to $450. Therefore, in order to prove that the amount Fortier converted to his own use was over $500,[10] it

---

fender's office within the month, thus necessitating a change of counsel for defendant.

**9.** The defendant points to the fact that after his indictment he could not secure employment similar to that which he held before the indictment; however, it would be unrealistic to ex-

pect any employer to hire and put into a position of trust someone who was indicted for embezzlement, and whose trial was pending.

**10.** General Laws 1956 (1969 Reenactment) § 11–41–5 at that time provided:

was necessary for the prosecutor to obtain evidence regarding the Reynolds account. Although the prosecutor later discovered that the amount missing from the Simonetti account was greater than $500, it is clear that at the time of the motion he believed that Reynolds's testimony would be crucial to his case. The fact that the prosecutor later discovered certain evidence that somewhat lessened the importance of Reynolds's testimony is not dispositive of the issue, for the time at which the materiality of the witnesses' testimony is to be determined is at the time the request is made. We are satisfied that at the time of the hearing the prosecutor possessed a good-faith belief in the materiality of the testimony, that he exercised due diligence in attempting to locate Reynolds, and that he had reasonable grounds to believe that he might be able to locate the witness at a later date.[11] *See State v. Patriarca*, 112 R.I. 14, 38, 308 A.2d 300, 315 (1973). All of this was put before the trial justice. We cannot say that his failure to be clairvoyant with respect to the prosecution's subsequent discoveries constituted an abuse of his discretion.

### III

The defendant's third contention is that the trial justice erred in allowing Richard Sheridan (Sheridan) who was at the time the collection accounts supervisor in the Division of Probation and Parole to identify defendant's signatures on checks and receipts admitted into evidence as exhibits in the state's case. He argues that Sheridan should not have been allowed to testify on the matter because he was not qualified as a handwriting expert.

At trial, Sheridan testified that he personally witnessed Fortier signing eleven checks, which were subsequently admitted into evidence. Considering these checks to be genuine writing samples, the prosecutor then asked Sheridan to give his opinion as to whether some fifty-one other checks and receipts were signed by Fortier. Fortier's counsel objected to the admission of some, but not all, of these documents. At any rate, the trial justice denied whatever objections Fortier's counsel made and allowed admission of all of the documents.

■ This issue is controlled by G.L.1956 (1969 Reenactment) § 9–19–17, which provides:

"Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses; and such writings, and the evidence of witnesses respecting the same, may be submitted to the court and jury as evidence of the genuineness, or otherwise, of the writing in dispute."

The statute vests discretionary power in the trial justice. The writing proposed to be used as a standard must be proved genuine to the satisfaction of the trial justice. In criminal cases such proof must be beyond a reasonable doubt. *State v. Danahey*, 108 R.I. 291, 299–300, 274 A.2d 736, 740 (1971).

■ The defendant relies heavily upon *Danahey* in support of his position; however, we note that the trial justice in *Danahey* did not rely on expert testimony in deciding that the document used as a standard was genuine. Rather he relied on the testimony of lay witnesses who gave circumstantial evidence of the document's authenticity. The expert only made a comparison of the documents. In the instant case, Sheridan testified without objection that he had seen Fortier sign the eleven

"Any person convicted of any offense under §§ 11–41–1 to 11–41–6, inclusive, if the value of the property or money stolen, received, embezzled, fraudulently appropriated or converted, or obtained, received, taken or secreted by false pretenses or otherwise with intent to cheat or defraud, or to embezzle or to fraudulently convert, exceed five hundred dollars ($500), shall be punished by imprisonment for not more than five (5) years, or by a fine of not more than one thousand dollars ($1,000), or by both, or if the value of such property or money does not exceed five hundred dollars ($500), such person shall be punished by imprisonment for not more than one (1) year, or by a fine of not more than five hundred dollars ($500), or by both."

11. *See People v. Negron*, 77 Ill.App.3d 198, 32 Ill.Dec. 674, 395 N.E.2d 1055 (1979).

checks that were later used as standards to compare the fifty-one disputed checks and receipts. Certainly, in light of the facts of this case, it was not an abuse of discretion for the trial justice to rely on this direct evidence in ruling that these documents were admissible.

 Once this threshold requirement is met, it is within the province of the jury to decide the authenticity of the disputed documents. Although a comparison made by a handwriting expert may be more convincing to a jury, the statute contains no requirement that such comparison be made by an expert.[12] The jury is free to attach whatever significance it deems appropriate to the testimony of any witness who gives an opinion on the genuineness of the disputed document. In light of the facts presented in this case, we find that the trial justice did not commit error when he allowed Sheridan to give his opinion on whether the signatures on the disputed documents were Fortier's.

## IV

The defendant next contends that the trial justice erred in admitting into evidence defendant's "progress report" concerning Stephen Reynolds. As indicated above, Reynolds did not appear as a witness at the trial. Thus, the prosecution introduced a "progress report" that defendant was alleged to have prepared at the behest of the judge who had placed Reynolds on probation. Fortier's signature does not appear on the report, but his typewritten name appears thereon.

The defendant contends that this document was hearsay and that it fell within none of the exceptions to the hearsay rule. Although it appears from the record that no proper foundation was laid for the admission of this evidence, such error, if indeed it was error, was not so prejudicial as to require a reversal of Fortier's conviction.

 It is well settled that the admission of hearsay evidence is not prejudicial when the evidence is merely cumulative and when defendant's guilt is sufficiently established by other competent evidence. *State v. Angell*, R.I., 405 A.2d 10, 14 (1979); *State v. Camerlin*, 117 R.I. 61, 362 A.2d 759 (1976). There is ample evidence in the record, independent of the progress report, which adequately supported the jury's finding of embezzlement of an amount greater than $500.[13] In fact, the jury could have properly returned the same verdict even if evidence concerning the Reynolds account had never been introduced. *See State v. Carillo*, 113 R.I. 32, 38, 317 A.2d 449, 453 (1974). There was sufficient evidence introduced by the state to allow the jury to convict defendant of embezzlement of an amount greater than $500 notwithstanding evidence of the discrepancy in the Reynolds account. (See footnote 13.) When viewed in this light, the admission of the progress report, if indeed it was error, was a harmless one.

## V

 Lastly, the defendant contends that the state failed to prove his guilt beyond a reasonable doubt. With respect to this contention, we have thoroughly examined the record and we conclude that the evidence presented by the state was sufficient for the jury to find defendant guilty beyond a reasonable doubt.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remitted to the Superior Court.

SHEA, J., did not participate.

---

12. Indeed expert evidence is not indispensable to prove the authenticity of the signature. *Wooddell v. Hollywood Homes, Inc.,* 105 R.I. 280, 252 A.2d 28 (1969) (civil case); *see also* Annot., 80 A.L.R.2d 272 (1961).

13. As indicated above the discrepancy in the Simonetti account was $550.