**STATE**

v.

**Andrew J. CHARETTE.**

**No. 79–362–C.A.**

Supreme Court of Rhode Island.

Sept. 4, 1981.

Dennis J. Roberts, II, Atty. Gen., Alyssa L. Talanker, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, John A. MacFadyen, III, Mary E. Levesque, Asst. Public Defenders, for defendant.

## OPINION

MURRAY, Justice.

This is an appeal from a Superior Court judgment of conviction in which the trial justice, after a jury-waived trial, found the defendant, Andrew J. Charette, guilty of assaulting with intent to murder his twenty-two-month-old son, Ronald Charette (Ronald). The defendant seeks reversal of his conviction on the grounds that there was insufficient evidence on the question of intent and that his constitutional right to a speedy trial had been denied. The defendant also claims that the trial justice erred in not dismissing the case for unnecessary delay under Rule 48(b) of the Superior Court Rules of Criminal Procedure. We reject the defendant's arguments and affirm the judgment of conviction entered against him in the Superior Court.

The events leading up to this near tragedy are essentially undisputed. At 7:30 p. m., October 3, 1976, Vivian Charette (Vivian), defendant's wife at that time (now Mrs. Vivian Perry), told defendant that she

was going out with a girl friend. In fact, Vivian spent the evening with her boy friend. When Vivian's boy friend drove her back to her apartment shortly after midnight, she was dismayed to see defendant sitting on the front steps, apparently awaiting her return. Not wishing to be seen with her boy friend, Vivian arranged to be dropped off on the street behind her apartment. She feared, however, that defendant would be suspicious of her entering the apartment by the back door. Accordingly, Vivian devised the following plan: she would enter the apartment by the back door and hide until her husband took his nightly shower. Vivian hoped than to leave the apartment and reenter by the front door, pretending she had just arrived.

In accordance with this plan, Vivian entered the apartment and chose the parlor closet as a hiding place. However, defendant's mounting tension because of his wife's continued absence caused him to alter his nightly routine. Instead of taking a shower, defendant stalked the parlor restlessly, rushing to the window at the sound of each passing car. All the while Vivian remained hidden nearby, listening anxiously for her opportunity to escape from the closet.

Vivian testified at trial that she heard the following sequence of events from her hiding place. The defendant's anxiety about his wife prompted him to call the police to report his wife as missing. He also called Vivian's mother and sister in an effort to locate her. Sometime later Vivian heard defendant wake their twenty-two-month-old son, Ronald, and say to him, "I know you're looking for your mommy, but she's not here. * * * Your mother don't care." She then heard defendant take a spoon from a drawer, open the bathroom closet, and spoon something into young Ronald's mouth. The child gagged and was then given something to drink by defendant. Vivian had been treating the child with Kaopectate, which made him gag, and she assumed that this was what her husband was giving Ronald.

Immediately thereafter, Vivian heard defendant call Fogarty Hospital, saying that his son had gotten out of his crib and had taken boric acid by accident. The defendant also called the Woonsocket police, who immediately dispatched Officer McKenna to take defendant and Ronald to the hospital for treatment. Meanwhile, a neighbor had come at defendant's request to watch defendant and Vivian's other four children. After defendant's departure, Vivian finally emerged from the closet and told the neighbor what she had heard. She then called the police. When the patrolman arrived, Vivian repeated her story and turned over the bottle of boric acid and a teaspoon she had found in the kitchen.

Meanwhile, Officer McKenna had taken defendant and Ronald to Rhode Island Hospital. Ronald was treated first in the hospital's emergency room. Later that morning he was also examined by Dr. Paul Pitel, a resident in the Pediatric Intensive Care Unit at that time. At the trial Dr. Pitel testified that he had diagnosed Ronald as having ingested boric acid. Although the exact amount of boric acid absorbed by the child was not determined,[1] Dr. Pitel testified that a teaspoonful, the amount defendant later confessed to having given the child, was within the lethal range for a child of Ronald's age and weight. Ronald was on the critical list for four days and remained in the hospital for another two days.

Later the same day, defendant was questioned at the Woonsocket police department and, after being advised of his *Miranda* rights, he signed a waiver-of-rights form. In his statement to the police, defendant confessed to having given Ronald a teaspoonful of boric acid. He stated that he had done this "because I knew I would have to take the baby to the hospital and this would force my wife to come home and to the hospital." The defendant also stated

1. The reaction to a turmeric-paper test performed to determine the presence of boric acid in Ronald's system was strong and positive. A blood sample sent to U.S. Borax Company would have established the actual amount absorbed by Ronald, but the sample was destroyed in the mail.

that after feeding the boric acid to Ronald, he wiped out the inside of the child's mouth and called Fogarty Hospital for advice.

I

The defendant challenges his conviction first on the ground that the state failed to prove beyond a reasonable doubt that he intended to murder his son. The defendant asserts in his brief that this was not his intent and that at most he should have been charged with assault with a dangerous substance. Lack of intent to murder is apparent, argues defendant, from his statement to the police indicating his preoccupation with his wife. The defendant contends in his brief that there is not "one shred of evidence" to support a finding of intent except his actual feeding of the boric acid to his son. The defendant concedes that his immediate call to Fogarty Hospital indicated his knowledge that boric acid would have "some ill effect on his son." He argues, however, that this act was also reflective of his concern for his son and therefore negates an intent to murder.

We are unable to accept defendant's arguments on this issue because they do not accurately reflect the law of this jurisdiction on intent to murder. In *State v. McGranahan*, R.I., 415 A.2d 1298 (1980), a case involving the death of an infant from a blow to the head with a plastic bottle, we discussed the concept of malice, express or implied, which is an essential element of murder. *Id.*, 415 A.2d at 1302 (*citing State v. Fenik*, 45 R.I. 309, 121 A. 218 (1923)). A finding of legal malice "can arise from either an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." We further defined malice as "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. McGranahan*, 415 A.2d at 1302.

 In the instant case, defendant's arguments fail to overcome the obstacles presented by *McGranahan*. The view of

legal malice presented by defendant places undue emphasis on express intent to kill and is thus inaccurate. A finding of malice may be based upon the conduct of a defendant, and an intent to kill may be inferred from an assault on a child. *Id.* The record in this case clearly shows that defendant had sufficient knowledge of the effects of boric acid to call the hospital immediately after feeding it to his son. Furthermore, evidence was adduced at trial that there was a label on the bottle of boric acid which specifically warned against ingestion of substance. We reject defendant's characterization of his act as no more than a means of getting his wife's attention. The defendant deliberately and willfully fed boric acid to a twenty-two-month-old child, with the awareness of potentially grave medical consequences. In our view this exhibits an "unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life", *id.*, and supports a finding of intent to murder. It must also be pointed out that this finding was made by trial justice sitting without a jury. It is therefore entitled to great weight and will not be disturbed unless it can be shown to be clearly wrong or unless the judge overlooked or misconceived material evidence. *In re LaFreniere*, R.I., 420 A.2d 82 (1980); *Citizens for the Preservation of Waterman Lake v. Davis*, R.I., 420 A.2d 53 (1980). The judgment of conviction in this case is well supported by the record and by applicable law and will not be set aside by this court.

II

The second issue raised by defendant concerns the right to a speedy trial which is guaranteed by the Sixth Amendment to the United States Constitution and by art. I, sec. 10, of the Rhode Island Constitution. The defendant contends that he was denied this right and that his conviction should therefore be reversed. We are fully aware of the importance of the right of a defendant in a criminal case to a speedy trial; however, we do not agree that this right has been abridged in this case.

In deciding this issue, our inquiry must go further than simply determining that there was delay. *See State v. Roddy*, R.I., 401 A.2d 23, 30 (1979); *State v. Paquette*, 117 R.I. 505, 509, 368 A.2d 566, 568 (1977); *State v. Crapo*, 112 R.I. 729, 734, 315 A.2d 437, 440 (1974); *Tate v. Howard*, 110 R.I. 641, 648 n.5, 296 A.2d 19, 24 n.5 (1972).

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court established the criteria to be considered in determining whether there has been a violation of the right to a speedy trial: the length of the delay, the reason for the delay, the assertion of the right by the defendant and the prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 116–17. *Accord, State v. Fortier*, R.I., 427 A.2d 1317, 1321 (1981); *State v. Delahunt*, R.I., 401 A.2d 1261, 1266 (1979); *State v. Roddy*, R.I., 401 A.2d 23, 30 (1979). If the delay is long enough to be considered "presumptively prejudicial," the remaining three criteria will be examined. *Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. The approach in *Barker* is a balancing test in which the conduct of both the prosecution and the defendant is weighed. *Id.* at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 116.

In the instant case defendant was arrested on October 5, 1976; and on December 10, 1976, a Providence County grand jury returned an indictment against defendant on a charge of mingling a poison with drink with intent to murder, in violation of G.L. 1956 (1969 Reenactment) § 11–16–5. However, the requirement of showing that defendant had mingled the boric acid with drink was impossible to fulfill because of the facts of this case.

Accordingly, the state filed an information on July 26, 1978, charging defendant with assault with intent to commit murder, under G.L. 1956 (1969 Reenactment) § 11–5–1.[2] The case proceeded to trial on April 18, 1979, and a judgment of conviction was entered on June 1, 1979, after a jury-waived trial. This period of two and one-half years between arrest and commencement of the trial is at least "presumptively prejudicial" and so leads us to examine the other factors set forth in *Barker*. *See Barker v. Wingo*, 407 U.S. at 530, 92 S.Ct. at 2192, 33 L.Ed.2d at 117. *See also State v. Fortier*, 427 A.2d at 1321 n.7; *State v. Delahunt*, 401 A.2d at 1266; *State v. Roddy*, 401 A.2d at 30.

The delay in the commencement of defendant's trial in this case is in part explained by the technical flaw in the original indictment. Although this might not be considered as valid a reason as a missing witness (an example cited in *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117), it was certainly not a deliberate attempt by the state to prejudice defendant. What we are confronted with in this case is what *Barker* described as a "neutral reason such as negligence or overcrowded courts [and] should be weighed less heavily [against the state] but nevertheless should be considered * * *." 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

In determining whether the delay in this case was unjustified, an examination of defendant's conduct is also necessary. As defendant notes, his arraignment on the information, originally scheduled for August 9, 1978, was continued on two occasions, apparently by defendant,[3] and was not held until September 6, 1978. The defendant argues that this one-month delay should not be weighed against him, citing

---

2. On September 21, 1978, the original indictment was dismissed by the state under Super. R. Crim. P. 48(a).

 The information also contained a second count charging defendant with violation of G.L. 1956 (1969 Reenactment) § 11–9–5, "Cruelty to or neglect of child." This count was severed from the trial and was dismissed by the state on June 1, 1979, pursuant to Super. R. Crim. P. 48(a).

3. The transcript of the hearing on defendant's motion to dismiss the information for lack of a speedy trial reveals that defense counsel offered to explain the continuances but was requested by the trial justice to wait until she had finished speaking. However, defense counsel did not later repeat his offer to explain. Furthermore, defendant concedes in his brief that the continuances appear to have been requested by the defense.

as support *Commonwealth v. Morgan*, 484 Pa. 117, 398 A.2d 972 (1979). That case, however, merely held that a delayed arraignment should not be held against a defendant when there was no resulting delay in the trial. In *Morgan*, because the trial date had been fixed prior to arraignment, the delay in the arraignment did not result in a trial delay. The record in the instant case, however, discloses no such situation.

In its brief, the state points out another instance of procrastination on the part of the defense. On April 4, 1977, the state filed requests for defendant's alibi and for discovery. The defendant's answer was not filed until January 1, 1978, nearly nine months later.

When this case was finally reached for trial on April 9, 1979, defendant failed to appear and a warrant was issued for his arrest. This happened again on April 18, 1979, and a bench warrant for defendant's arrest was issued to ensure his appearance. Later that morning the trial finally commenced. These events force us to conclude that defendant must share responsibility for the delay in his trial.

 The third factor to consider in this issue is whether defendant asserted his right to a speedy trial. The defendant correctly notes in his brief that this right is not waived solely by failure to make a demand. *Barker v. Wingo*, 407 U.S. at 528, 92 S.Ct. at 2191, 33 L.Ed.2d at 115. However, this remains a relevant factor, especially in view of the fact that defendant was responsible for some of the delay. *Id.* at 529, 92 S.Ct. at 2191, 33 L.Ed.2d at 116. The record does not indicate that a motion for a speedy trial was ever made during the entire two-and-one-half-year history of this case, and it was not until the trial commenced on April 18, 1979, that defendant moved to dismiss for lack of a speedy trial.

 The final step in the *Barker* test is determining whether the delay has preju-

diced the defendant. Prejudice may take the form of pretrial incarceration, anxiety and mental strain, or impairment of the defense of the case. *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. *Accord, State v. Fortier*, 427 A.2d at 1322; *State v. Roddy*, 401 A.2d at 31. Of these factors impairment of the defense is the most significant. *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. In the instant case defendant was not subjected to oppressive pretrial incarceration, nor was the conduct of his defense impaired by the passage of time. The defendant may have suffered personal prejudice, but there is no showing of this in the record beyond defense counsel's arguments at trial.[4] The defendant's failure to demand a speedy trial, discussed above, is relevant in deciding whether he has been prejudiced. In *Barker, supra*, the Court noted that

"[t]he strength of [the defendant's] efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. *The more serious the deprivation, the more likely the defendant is to complain.*" (Emphasis added.) *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

The defendant has not convinced us that his right to a speedy trial has been impaired by the delay in his case.

 A delay of two and one-half years between arrest and trial should not be taken lightly. The state's excuse of a technically flawed indictment does not present the strongest possible justification. On the other hand, not only did defendant fail to demand a speedy trial but he also contributed to the delay. In view of our further finding of no serious prejudice to defendant, we hold that his right to a speedy trial has not been denied.

---

4. At the hearing on defendant's motion to dismiss the information for lack of a speedy trial, defense counsel claimed that defendant had suffered greatly, that he had lost jobs, that he was now on welfare, that he was shunned by his family, and that he was now plagued by epileptic seizures. However, no evidence was introduced to substantiate these claims.

### III

The final issue before us concerns the defendant's claim that the trial justice abused her discretion by not dismissing the information for unnecessary delay under Super. R. Crim. P. 48(b).[5] In his brief the defendant directs our attention to *State v. Grover*, 112 R.I. 649, 314 A.2d 138 (1974), in which we stated that Rule 48(b) goes beyond a defendant's right to a speedy trial. *Id.* at 651, 314 A.2d at 139. Although this is true, Rule 48(b) is nevertheless inapplicable in the instant case. In *State v. Paquette*, 117 R.I. 505, 368 A.2d 566 (1977), we indicated that a defendant seeking dismissal under this rule must be able to show that he was not responsible for any of the delay. *Id.* at 511, 368 A.2d at 569. *See State v. Fortier*, 427 A.2d at 1323. Such is clearly not the case here.

The defendant's appeal is denied and dismissed, the judgment of conviction appealed from is affirmed, and the case is remanded to the Superior Court.

---

5. The record discloses that in his motion to dismiss for lack of a speedy trial defendant did not specifically mention Rule 48(b). However, because the underlying principle was raised and fully discussed in defendant's motion, we feel that the issue is properly before us.