STATE

v.

**William H. ANTHONY and John A. DePari.**

**No. 79–491–C.A.**

Supreme Court of Rhode Island.

July 22, 1982.

See also, R.I., 397 A.2d 1309.

Dennis J. Roberts, II, Atty. Gen., Madeline Quirk, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Chief Appellate Atty., Janice M. Weisfeld, Asst. Public Defender, for defendants; John A. MacFadyen III, Asst. Public Defender, on brief.

## OPINION

KELLEHER, Justice.

This criminal appeal arises from the fatal stabbing of Peter Lombardi, an inmate at the Adult Correctional Institutions (ACI), on February 28, 1975. In connection with this incident a grand jury returned an indictment against William H. Anthony, John A. DePari, and Robert M. Demirjian on April 4, 1975, charging them with murder and conspiracy to commit murder. The indictment against Demirjian was subsequently dismissed upon his demise in February 1976. The defendants Anthony and DePari entered pleas of not guilty. A bail hearing for the defendants was combined with a violation hearing for defendant Anthony who had previously received a five-year suspended sentence and five years' probation on an unrelated charge. During this hearing the state's primary witness, Paul Fairhurst, a fellow inmate of the defendants and an unindicted coconspirator, implicated both defendants in Lombardi's murder. His testimony, however, was proffered only after he had been granted transactional immunity by the Presiding Justice of the Superior Court at the request of the Office of the Attorney General.

Relying upon Fairhurst's testimony, the trial justice concluded that if a jury was to believe his account of the incident, there was a fair likelihood that defendants could be found guilty of first- or second-degree murder and, in regard to that charge, ordered them held without bail. On the charge of conspiracy to commit murder, bail was set for each at $20,000 with surety.

Fairhurst's bail-hearing account of the murder was related during three days of testimony in April of 1975. More than two years later, however, he recanted his testimony and refused to testify in any further proceedings against defendants even though this would subject him to the imposition of a jail sentence for contempt. In response to the inquiries of the trial justice during a July 6, 1977 hearing on defendants' motions to dismiss, Fairhurst stated that he would not testify at trial against Anthony and DePari because it would be a "lie." The trial justice took no action against Fairhurst at that time, but ordered the state prosecutor to see that the case was assigned to the September 1977 calendar for trial. Although the state and both defendants were ready to proceed in September, the month passed without the com-

mencement of trial; a Superior Court justice who had not been previously involved with the case *sua sponte* continued the proceedings for thirty days to afford Fairhurst time to reconsider and avoid the imposition of contempt sanctions. This reflective period apparently had little effect on Fairhurst, for at the end of the thirty days he remained adamant in his refusal.

The defendants were finally brought to trial on October 11, 1977. Fairhurst took the stand after being called by the prosecution but simply indicated that he would not testify. Portions of his bail-hearing testimony were later read to the jury by a court stenographer, followed by the trial justice's explanation that in addition to immunity from prosecution the state had promised Fairhurst a transfer to an out-of-state prison. The jury returned guilty verdicts against both defendants on the murder and conspiracy counts. As a result, under the then-operative provisions of G.L.1956 (1969 Reenactment) § 11–23–2, as amended by P.L.1973, ch. 280, § 1, defendants were subject to the mandatory penalty of death. Imposition of the judgment, however, was arrested pending the outcome of appellate review of the various constitutional challenges that had been lodged against this statutory penalty. In *State v. Cline*, R.I., 397 A.2d 1309 (1979), the court ruled this mandatory death penalty constitutionally impermissible and on March 16, 1979, remanded the case now before us to the Superior Court for further proceedings, including the imposition of sentence. *State v. Anthony*, R.I., 398 A.2d 1157 (1979).

On remand a hearing was held on defendants' motions for a new trial. After four days of testimony the trial justice denied these motions, and on June 7, 1979, defendants were sentenced to the ACI for life on the murder charges and given ten-year consecutive sentences on the conspiracy charges. The principal challenges to these convictions presented by defendants on appeal are predicated upon the constitutional rights of speedy trial and confrontation guaranteed by the Sixth Amendment to the United States Constitution and article I, section 10, of the Rhode Island Constitution.

I

Speedy Trial Issue

The defendants' claim of violation of their right to a speedy trial stems from the passage of some thirty-two months between the time they were first charged with Lombardi's murder, February 28, 1975, and the date they were eventually brought to trial, October 11, 1977. On the basis of this delay defendants sought dismissal of the indictments against them pursuant to Rule 48(b) of the Superior Court Rules of Criminal Procedure as well as the constitutional provisions cited.

█ Focusing first upon the Rule 48(b) motions, we note that although this rule was designed to implement the right of speedy trial it is actually far broader in scope than the guarantees contained in our Federal and State Constitutions. By its terms it confers upon the Superior Court the power to dismiss an indictment, information, or complaint solely because of unnecessary delay in bringing a defendant to trial. To come within its parameters, a defendant need only demonstrate that he or she is not responsible for the delay in question. The burden of showing justification for the delay then shifts to the state. However, because the rule vests such discretion in the court, a trial justice's ruling on this type of motion will not be set aside on appeal unless it constitutes a clear abuse of discretion. *State v. Dionne*, R.I., 442 A.2d 876, 881 (1982); *State v. Fortier*, R.I., 427 A.2d 1317, 1323 (1981); *State v. Paquette*, 117 R.I. 505, 510–11, 368 A.2d 566, 569 (1977); *State v. Grover*, 112 R.I. 649, 652, 314 A.2d 138, 139 (1974).

█ After reviewing the record, we find such an abuse of discretion, but only with respect to defendant DePari's motion. The only portion of the thirty-two-month period directly chargeable to DePari is that occurring from April 28, 1975, to June 5, 1975, as a consequence of his motion to strike the twenty-one-day trial notice he received in April 1975, and to enlarge the time in which

to complete discovery. In contrast to this short delay of slightly more than one month, some twenty-eight months elapsed from the close of the discovery period until the commencement of trial. None of this latter period of delay is directly attributable to DePari. We therefore find that DePari's initial request to postpone trial in the very early stages of these proceedings in no way bars him from moving to dismiss the indictment under Rule 48(b). *State v. Dionne,* 442 A.2d at 881; *see Dufield v. Perrin,* 470 F.Supp. 687, 692 (D.N.H.1979) (defendant's motion to continue trial in order to consolidate indictment with other charges pending against him which resulted in temporary delay did not constitute a waiver of his speedy-trial right for period of delay occurring after indictments were consolidated).

To justify this lengthy delay, the prosecutor, at the July 6, 1977 hearing on defendants' speedy-trial motions, offered four reasons for the delay. He prefaced his explanation by stressing that the state at all times intended and strongly desired to proceed against both defendants in one consolidated trial. The first reason he gave related to the fact that defendant Anthony's counsel was an extremely busy defense attorney who for four months of this delay period had been engaged in trial in the celebrated "Bonded Vault" case.[1] As a second reason he indicated that Anthony was already under indictment in another murder case at the time the indictments in the case at bar were returned against him and DePari. Anthony was tried and sentenced under this prior indictment while both he and DePari awaited trial for Lombardi's murder. And third, he noted that on September 26, 1975, DePari's court-appointed counsel was replaced by newly retained private counsel. Fourth and last, the prosecutor pointed out that the Superior Court took control of the trial calendar in January 1977 and thus, he argued, any de-

lay occurring after that date should not be charged to the prosecution.

■■■ The first two reasons advanced by the prosecution do not justify the number of months DePari was forced to await trial. Both concern delays arising from Anthony's situation and are not attributable to DePari merely as a codefendant in the absence of some evidence that he acquiesced in or contributed to these delays. *See Glass v. United States,* 395 A.2d 796, 801 (D.C.App.1978); *Commonwealth v. Thomas,* 266 Pa.Super.Ct. 381, 384, 404 A.2d 1340, 1342 (1979). Indeed, the record indicates the contrary. Upon learning of these reasons for the delay, DePari's counsel immediately moved for a separate trial to avert any further delay that might result from the consolidation of the indictments. The state opposed any severance, and the trial justice denied the request. Although we recognize that the state has a significant interest in avoiding a duplicity of trials for joint defendants, we do not believe this interest sufficient to warrant the passage of nearly three years before DePari was brought to trial.

■■■ The prosecution's remaining grounds for the delay are similarly inadequate with respect to defendant DePari. The state cannot presume that an accused desires a postponement of trial merely because there is a change of defense counsel during the course of the proceedings. Unless it is asserted otherwise, the government must assume that a defendant wants a speedy trial. *United States v. Calloway,* 505 F.2d 311, 317 (D.C.Cir.1974); *Branch v. United States,* 372 A.2d 998, 1002 (D.C.App.1977). Moreover, at no time during the course of their representation of DePari did substituted private counsel ever request a continuance.

■■■ Finally, in evaluating the necessity of a delay under Rule 48(b) it is of little import whether the delay be charged to the prosecution or to the court system.[2] As

---

1. As one may recall from the notoriety accompanying the incident, this case involved the August 14, 1975 robbery of the Bonded Vault Company in which the perpetrators netted about $4 million in cash and valuables. The

trial in that case was protracted, extending from April 12, 1976, to August 12, 1976. *See State v. Byrnes,* R.I., 433 A.2d 658 (1981).

2. We find it necessary to comment on the pros-

remarked in *Tate v. Howard*, 110 R.I. 641, 654, 296 A.2d 19, 27 (1972), "the state, if it indicts a person, must be prepared to give him a trial without any unnecessary delay. The satisfaction of this obligation requires a cooperative effort between the three branches of government." Notwithstanding court congestion or prosecution difficulties in scheduling, the resultant delay must still be weighed against the government, for it bears the ultimate responsibility to ensure that an accused is expeditiously brought to trial. *Dufield v. Perrin*, 470 F.Supp. at 690; *State v. Allan*, R.I., 433 A.2d 222, 224 (1981); *State v. Crescenzo*, 118 R.I. 662, 665, 375 A.2d 933, 935 (1977). For the foregoing reasons we find that the state has failed to satisfy its burden to justify the undue delay in bringing DePari to trial and, therefore, conclude that the trial justice exceeded the bounds of his discretion in denying DePari's motion to dismiss the indictment under Rule 48(b).

A similar conclusion cannot be reached regarding Anthony's Rule 48(b) motion because a considerable portion of the delay is directly attributable to him. We already noted the disposition of another murder charge against Anthony during the pendency of the proceedings here on review. Ironically, the indictment in this other case was returned against Anthony on the very same day that Lombardi was murdered. The trial in that proceeding commenced with the impaneling of the jury on March 9, 1976, was passed on March 15, 1976, resumed on February 2, 1977, and terminated with the conviction of Anthony on February 12, 1977. Given the serious nature of that case and the involvement of a total of four defendants, we presume that the amount of time the state spent in preparing for trial

was not insignificant, and Anthony must therefore shoulder some of the responsibility for the delay in these subsequent Lombardi murder proceedings. *See State v. DeMasi*, R.I., 419 A.2d 285 (1980), *vacated on other grounds*, 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981).

■ Our ruling on Anthony's Rule 48(b) motion is not, of course, dispositive of the constitutional aspects of his speedy-trial claim. Resolution of this issue requires the four-pronged analysis enunciated in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): (1) length of the delay, (2) reason for the delay, (3) defendant's assertion of the right to a speedy trial, and (4) prejudice to the accused. *See State v. Fortier*, 427 A.2d at 1321.

■ The thirty-two-month delay in the instant case does not by itself establish a deprivation of Anthony's speedy-trial right. *State v. Allan*, 433 A.2d at 224; *State v. Crescenzo*, 118 R.I. at 665, 375 A.2d at 935. However, it is of sufficient duration to be "presumptively prejudicial," thereby triggering the necessity of inquiring into the other three factors. *See State v. Charette*, R.I., 434 A.2d 280, 284 (1981) (two and one-half years' delay presumptively prejudicial); *State v. Allan*, 433 A.2d at 224 (thirty-three-month delay presumptively prejudicial); *State v. DeMasi*, 419 A.2d at 289 (twenty-six-month delay presumptively prejudicial).

■ Reviewing the reasons for the delay, we believe that a consideration to be weighed against Anthony is the fact that he shares responsibility for some of the delay as a result of the criminal charges pending at the time the indictment in the case at bar was returned. Similarly, the state

---

ecutor's reference to a transfer of control of the Superior Court criminal calendar in January 1977 from the Office of the Attorney General to the Superior Court. We had thought the notion that the Attorney General had, prior to this date, exercised complete control of the calendar was long laid to rest in *Tate v. Howard*, 110 R.I. 641, 296 A.2d 19 (1972). In that decision the court explained,

"[W]hile we have recognized the Attorney General's power to conduct prosecutions on behalf of the state, once criminal process is issued either by way of complaint or indictment, his power is subject to both the judiciary's right and power to provide for an orderly administration of criminal justice within the judicial system and its obligation to protect an accused's right to due process and speedy trial." [Citations omitted.] *Id.* at 653, 296 A.2d at 26.

must be charged with some of this delay in light of the two years it took to dispose of these prior charges and the additional eight months that elapsed between their disposition and the commencement of trial in this case. Nevertheless, we attach only minor weight to the state's role in the delay associated with this unrelated proceeding because delay caused by neutral factors such as crowded dockets is weighted less heavily than deliberate delay for tactical purposes. *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117; *State v. Charette*, 434 A.2d at 284; *State v. DeMasi*, 419 A.2d at 290.

 As for the four months during which defense counsel was unavailable because of the Bonded Vault trial, we find no merit to the state's argument that Anthony must bear the burden for this delay. The predicament in which counsel found himself was in no way his fault; the scheduling of criminal trials is a matter within the control of the courts and, to some degree, the attorney general's office. The situation in *Cochrane v. Laurie*, 118 R.I. 903, 371 A.2d 605 (1977), cited by the state is simply not analogous to the one presented here. In *Cochrane* the defendant was held to have waived his statutory right to bail after being incarcerated for six months without being tried—in part because of the unavailability of his private counsel. After objecting to the court's appointed counsel, Cochrane retained private counsel who was already committed in another prolonged criminal proceeding. Thus, the court found that the defendant was willing to wait in jail while his selected counsel fulfilled his other trial obligations. In the case at bar, at the time counsel was retained, it was highly unlikely that either he or his attorney could have anticipated that the Bonded Vault trial would go forward well in advance of defendant's trial. The robbery in that case occurred more than five months after the Lombardi killing, and Anthony had already been awaiting trial for almost a year before the entry of his counsel's appearance in the Bonded Vault case. Moreover, the fact remains that the instant case was never even assigned for trial in 1976 when counsel was occupied in this other proceeding. *See State v. Byrnes*, R.I., 433 A.2d 658 (1981).

Finally, Anthony posits one additional reason for the delay; he suggests that the prosecution may have deliberately delayed the trial while attempting to persuade Fairhurst to reconsider his refusal to testify. This type of delay would fall within the category of intentional delay to achieve a tactical advantage over defendant and, as such, would be charged more heavily against the state than the other reasons thus far discussed. Unfortunately, the trial justice did not permit defense counsel to question the prosecutor under oath in this regard. We find nothing objectionable to such relevant inquiry and do not understand why the trial justice precluded this narrow avenue of questioning since he allowed defense counsel to testify under oath about the prejudice to defendants resulting from the delay. Under these circumstances, then, we shall assume simply for purposes of our analysis that some of the delay was tactically motivated and weigh this against the state.

 We turn next to the third factor, assertion of the right. Anthony's first invocation of the right came some two years after the return of the indictment with the filing on April 19, 1977, of a demand for a speedy trial and a motion to dismiss for denial of the same. Thereafter he filed a second demand for speedy trial on May 10, 1977, and renewed the motion to dismiss on June 17 and September 19, 1977. Anthony's failure to assert his speedy-trial right during the two years following his indictment hardly demonstrates an active pursuit of this right. Such lack of aggressive action in demanding a speedy trial does not alone constitute a waiver but nonetheless is an important consideration, particularly since a portion of the delay is attributable to Anthony. *See State v. Charette*, 434 A.2d at 285; *compare Tate v. Howard*, 110 R.I. at 656, 296 A.2d at 27 (defendant's vigorous demands for trial by "figuratively banging on the courthouse doors" asking to

be heard was persuasive in determining that his speedy-trial right had been abridged).

This brings us to the final factor in this fourfold test—prejudice resulting from the delay. This last criterion focuses upon prejudice in the form of pretrial incarceration, anxiety and mental strain, and impairment of the defense. *State v. Charette*, 434 A.2d at 285; *State v. Fortier*, 427 A.2d at 1322. A greater portion of the pretrial incarceration involved here is due in the first instance to the pendency of the prior unrelated charges previously mentioned. However, as defense counsel argued and the trial justice acknowledged, the anxiety normally accompanying the uncertainties of trial and the mental strain often experienced by an incarcerated accused while awaiting trial was no doubt exacerbated for Anthony by virtue of the delay in the case at bar, carrying with it as it did the very real threat (at the time) of the death penalty.

Defense counsel asserts further personal prejudice to Anthony as a consequence of his ineligibility for various programs available to other inmates while this charge remained undisposed and, throughout this entire pretrial period, his segregated confinement to a cell for twenty-three hours of each day. We are not insensitive to the severity of Anthony's pretrial imprisonment, but we remain unpersuaded that the conditions under which he then lived were entirely occasioned by the delay in question in light of the other murder charge pending against him. Additionally, Anthony's failure to demand a speedy trial earlier in these proceedings in the face of such confinement is relevant to our assessment of the personal prejudice suffered. *State v. Charette*, 434 A.2d at 285. As the Supreme Court stated in *Barker*, "The more serious the deprivation, the more likely the defendant is to complain." *Barker v. Wingo*, 407 U.S. at 531, 92 S.Ct. at 2192, 33 L.Ed.2d at 117.

Anthony presents a stronger claim of prejudice to the presentation of his defense based upon the death of two witnesses characterized by defense counsel as material to the case. One of these witnesses was codefendant Demirjian, who died on February 9, 1976. According to counsel who had represented him, Demirjian would have taken the stand at trial and testified on behalf of himself and his codefendants. Once again we think it noteworthy that the loss of such testimony did not move Anthony to demand a speedy trial; his earliest assertion of the right came more than one year after Demirjian's demise.

The other witness, John A. Rossi, was an inmate who had been housed at the time of the murder in a cell located within three or four cells of the area in which the Lombardi stabbing took place. Rossi's death occurred in March 1977. Defense counsel interviewed him two or three months after the indictment was filed and learned from their interview that Rossi had been in his cell at the time of the incident. After having been sworn, DePari's counsel testified that Rossi unequivocally stated that at the time in question he did not see defendants Anthony or DePari on the tier where Lombardi's body was found. In response to the prosecutor's inquiry, counsel indicated that his questions of Rossi had been limited to the whereabouts of defendants and that he had not asked him if he had seen anyone else on the tier during this critical time. The trial justice expressed doubts about the materiality of Rossi's alleged testimony, finding it "somewhat vague" and more in the nature of a statement of what he did not see rather than an affirmative statement exculpating defendants. Although Rossi's alleged observations are rather general, the very crux of the problem is his unavailability for direct examination during which trial counsel would have had an opportunity to elicit a more detailed account of what he witnessed on the night of the murder. We disagree with the trial justice and find that in this regard Anthony has demonstrated prejudice to the defense of his case. *See e.g., United States v. Mays*, 549 F.2d 670, 682–85 (9th Cir. 1977) (Ely, dissenting); *Branch v. United States*, 372 A.2d at 1002.

No one of the above factors is dispositive of the speedy-trial issue. Rather,

each factor must be balanced against the others and assessed as a whole. *Barker v. Wingo,* 407 U.S. at 533, 92 S.Ct. at 2193, 33 L.Ed.2d at 118. This evaluation process is a difficult one because the right itself is of an amorphous quality, there being no set point in the criminal proceedings at which one can definitively say that it has been abridged. *State v. Fortier,* 427 A.2d at 1321. On balance, we conclude that Anthony's speedy-trial right has not been abridged. The prejudice he has demonstrated is outweighed by his own contribution to the delay and his late assertion of the right.

## II

### Confrontation Issue

Having ruled favorably on DePari's speedy-trial claim, we need only address the additional issues asserted by Anthony in challenging his conviction. His next major contention is that the introduction of Fairhurst's bail-hearing testimony at trial violated his right of confrontation because it bore no substantial indicia of reliability and was educed without an adequate opportunity for cross-examination.

At the April 1975 bail hearing Fairhurst gave a detailed account of his version of the February 28 stabbing incident. Lombardi's body was discovered on B-tier in the admissions and orientations section of the Maximum Security Building of the ACI commonly referred to as "A and O" at approximately 8:30 p.m. Fairhurst testified that shortly before, between 8 and 8:15 p. m., he, defendants, and Lombardi had been socializing near the gym housed in the same building. Generally, all inmates in the building, with the exception of those placed in the Behavioral Custody Unit, were at that time permitted to walk freely throughout the various sections of the building and mingle with one another during the hours of 4:30 p.m. to 9 p.m. According to Fairhurst, Lombardi announced that he was going to visit inmate Donald Prout at his cell on B-tier in the A and O section. As soon as Lombardi was out of hearing range, defendant Anthony allegedly stated that he

would "like to stab that guy [Lombardi]." Fairhurst explained that Anthony was upset with Lombardi because several days earlier he had been blamed by the black inmates for the smashing of Lombardi's television set. Anthony supposedly indicated that he was going to B-tier to "straighten out the beef with Lombardi" and requested that Fairhurst, DePari, and Demirjian "back up his play."

Fairhurst stated that Anthony went to Prout's cell, and he and the other defendants followed shortly thereafter. When they arrived, Lombardi, Prout, and Anthony were arguing about the television set. During the course of this argument, Fairhurst alleged, DePari stabbed Lombardi in the back. Lombardi staggered up against the cell door, and Anthony then allegedly inflicted three or four nonfatal wounds to Lombardi's chest and abdominal areas. Fairhurst stated that after Lombardi was stabbed, he and defendants left B-tier and mingled with the other inmates.

As mentioned, this description of the events surrounding Lombardi's murder was read to the jury by a court stenographer because of Fairhurst's persistent refusals to testify at trial. However, at the hearing on defendant's new-trial motions some four years after his initial testimony, Fairhurst again agreed to testify. On this occasion he related a dramatically different account of the attack on Lombardi. Fairhurst confessed that he, rather than DePari, had delivered the mortal blow to the victim's back; that Demirjian, rather than Anthony, had stabbed the victim three or four times in the chest and stomach; and that the altercation over which the attack had occurred concerned drugs, rather than the smashing of the victim's television set. In fact, Fairhurst stated that neither Anthony nor DePari was present on B-tier at the time of the killing.

When asked under oath why he had implicated defendants, Fairhurst responded that their names had been mentioned to him by the state police as possible suspects. He explained that the story he had related to the state police and again at the bail

hearing was invented in an attempt to protect himself. In addition, he asserted that the statements he had given to the state police as well as his previous testimony were a product of coercion. On the night of the murder, at his request, Fairhurst was taken to the state police barracks where he remained for the next three months. Fairhurst alleged that during his first night at the barracks he was beaten by three state police detectives. He further contended that his accusations against defendants were coerced in the sense that they were prompted by promises from the state police and the attorney general's office of immunity from prosecution for his participation in the crime, transfer to an out-of-state prison, and early parole. Insisting that his present testimony was in fact the truth, Fairhurst attributed his failure to come forward earlier in the proceedings to his fear of being charged with murder even though granted transactional immunity and to his desire to "cover" himself and make himself "look good." Finally, he ascribed his concern for setting the record straight to his distaste for "living with the fact that I lied."

It is apparent to us, after reviewing the entire transcript generated during four years of proceedings in this case, a document totalling some 1,100 pages, that any assessment of Fairhurst's conflicting testimony based upon a cold record, even with the benefit of hindsight, is at best very difficult. Of course, evaluating a witness's credibility from a dispassionate record is a problem inherent in almost any prior re-corded testimony. Furthermore, our determination of whether or not it was an abuse of discretion to permit the introduction of Fairhurst's bail-hearing testimony at trial must be made in view of only those portions of the record available to the trial justice at the time of his evidentiary ruling.[3] See State v. Ouimette, 110 R.I. 747, 754, 298 A.2d 124, 130 (1972).

Our comment is offered merely to highlight the importance of live testimony so that the trier of fact can assess a witness's credibility on the basis of demeanor as well as the testimony. Indeed, as construed by the Supreme Court, the confrontation clause

"envisions 'a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.' Mattox v. United States, 156 U.S. 237, 242–243 [15 S.Ct. 337, 339–340, 39 L.Ed. 409]." Ohio v. Roberts, 448 U.S. 56, 63–64, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597, 606 (1980).

In short, one of the overriding purposes of the clause is to "augment accuracy in the factfinding process by ensuring the defendant an effective means to test adverse evidence." Ohio v. Roberts, 448 U.S. at 65, 100 S.Ct. at 2539, 65 L.Ed.2d at 607. Consequently, the prior recorded testi-

---

**3.** The trial justice was not completely unaware of Fairhurst's subsequent account of the incident. Before the reading of the bail-hearing testimony was completed, it was brought to the trial court's attention that Fairhurst had written one of the defense counsel explaining that his testimony was a lie and that he was the one who had stabbed Lombardi. Fairhurst was brought back before the court, but defense counsel declined to call him as a witness because they believed they would not be able to cross-examine him if he appeared on behalf of the defense. Fairhurst's possible availability at this juncture of the trial certainly raises questions about the state's obligation to recall him to the stand and defendant Anthony's obliga-tion to call him as a witness for the limited purposes of cross-examination. Neither party has addressed these questions on appeal, and it remains entirely speculative whether or not Fairhurst would have actually testified before the jury. In the interest of avoiding what may prove to be a futile gesture, we shall dispose of the case on the merits of the confrontation issue rather than remand it for a determination of whether Fairhurst was in fact unavailable throughout the entire course of the trial. We also note that in his appeal Anthony does not contest the trial justice's finding that Fairhurst was not available to the state as a witness by virtue of his refusal to testify.

mony or other out-of-court statement of a witness who is unavailable for trial may only be admitted at trial against an accused if it bears adequate "indicia of reliability." *Mancusi v. Stubbs,* 408 U.S. 204, 213, 92 S.Ct. 2308, 2313, 33 L.Ed.2d 293, 301–02 (1972); *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213, 227 (1970); *California v. Green,* 399 U.S. 148, 161, 90 S.Ct. 1930, 1936–37, 26 L.Ed.2d 489, 498–99 (1970). The Supreme Court has been willing to infer such constitutionally sufficient reliability from the mere fact that the statements sought to be introduced fall within a traditionally recognized hearsay exception. When an exception is not present, the testimonial evidence must be excluded in the absence of establishing "particularized guarantees of trustworthiness." *Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608.

■ In the case at bar the recorded testimony in issue does not qualify under any of the well-settled exceptions to the hearsay rule. For reasons that will be discussed *infra,* Fairhurst's testimony does not satisfy the recognized former-testimony hearsay exception because we are of the opinion that the opportunity for cross-examination afforded Anthony was inadequate. *See State v. Ouimette,* 110 R.I. at 753, 298 A.2d at 129; *compare* Federal Rules of Evidence, 804(b)(1). Nor does it fall within the declaration-against-interest hearsay exception, though seemingly against Fairhurst's penal interest by revealing his own participation in the murder conspiracy, because of the all-encompassing immunity shrouding him from criminal liability. Moreover, Anthony cites three circumstances that he contends affirmatively demonstrate the untrustworthiness of this testimony.

First, he points out that unlike most sworn statements, Fairhurst's account is not worthy of the usual inference of reliability afforded testimony delivered under oath because the transactional immunity conferred upon him also embraced any possible perjury charge that might result from his statements at the hearing. *See* G.L.

1956 (1981 Reenactment) § 12–17–15, subsequently amended by P.L.1981, ch. 217, § 1 and ch. 243, § 1. *State v. Paquette,* 117 R.I. 638, 369 A.2d 1096 (1977). Furthermore, any evidence of reliability attaching to testimony transcribed during proceedings in which the circumstances closely approximate those surrounding a typical trial, *California v. Green,* 399 U.S. at 165, 90 S.Ct. at 1938, 26 L.Ed.2d at 501, is substantially undermined by Fairhurst's repudiation and characterization of his story as a "lie."

Second, Anthony notes that just as Fairhurst was about to launch into a description of the events occurring after he and defendants had left the gym area of the prison, Fairhurst's appointed counsel abruptly interrupted the testimony and requested to be excused from the proceedings. He indicated that if he remained he might be compelled as an "officer of the Court" to make some statements in contravention of the attorney-client privilege, and he further explained that the basis for the request related to a "question of where my duty is, and where my duty isn't, both to the Court and to this [Fairhurst] defendant." After a chamber conference with Fairhurst's counsel, the trial justice remarked that there was "no problem" and the hearing resumed. Anthony suggests that the only plausible explanation for this highly unusual episode is counsel's realization that Fairhurst was about to perjure himself.

The third manifestation of untrustworthiness, Anthony asserts, bolsters this conclusion that Fairhurst was lying at the bail hearing. It was brought out on cross-examination that in an unrelated criminal case Fairhurst had testified before a grand jury and implicated as a codefendant an individual who apparently had no involvement in the crime under investigation; he also denied the involvement of a defendant who, presumably unbeknown to Fairhurst, had pleaded guilty to the charge. Immediately thereafter the attorney general's office requested that Fairhurst be held without bail pending the possible imposition of a perjury charge as a result of his grand-jury testimony.

■ The trial justice dismissed these factors as bearing only on the question of Fairhurst's credibility, a matter strictly within the province of the jury. He apparently viewed the reliability issue to be limited to an evaluation of whether or not the witness was "in a position or location to see what he testified under oath that he saw." We cannot agree with such a circumscribed interpretation. The focus of the reliability determination is the underlying trustworthiness of the recorded testimony whereas the focus of a credibility assessment is the weight to be afforded such testimony. *See Ohio v. Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539, 65 L.Ed.2d at 608; *Mancusi v. Stubbs,* 408 U.S. at 213, 92 S.Ct. at 2313, 33 L.Ed.2d at 301–02. A declarant's prior recorded statement may be trustworthy yet nevertheless entitled to little weight.

The factors Anthony adverts to are entirely appropriate considerations in determining the reliability of Fairhurst's prior recorded testimony. Moreover, Anthony does not claim that any one of these overt indications of unreliability necessarily bars the admission of the testimony at trial. Rather, the thrust of his argument is that their cumulative impact so substantially undercuts Fairhurst's veracity as to require a finding of insufficient indicia of reliability to satisfy the confrontation clause. We agree that at the very least these indicators cast a cloud of doubt over Fairhurst's bail-hearing version of the stabbing incident. We need not, however, decide whether the admission of the testimony was erroneous solely on this basis for, as previously noted, we are of the opinion that Anthony was denied an adequate opportunity to cross-examine Fairhurst at the bail hearing.

■ In *State v. Ouimette,* 110 R.I. at 756, 298 A.2d at 131, we emphasized that "the confrontation clause is not violated by the admission at a subsequent hearing of the prior testimony of the unavailable witness where at the prior hearing the opportunity for adequate cross-examination was afforded" the accused. The rationale for this holding is that one of the paramount aims of the confrontation provision is to ensure "the trier of fact a satisfactory basis for evaluating the truth of the prior statement." *California v. Green,* 399 U.S. at 161, 90 S.Ct. at 1936, 26 L.Ed.2d at 498. Indeed, the opportunity to develop an adequate cross-examination is an integral element of the reliability test. Professor Wigmore qualified cross-examination as the "greatest legal engine ever invented for the discovery of truth," 5 Wigmore, *Evidence* § 1367 at 32 (Chadbourn Rev.1974), and Professor Weinstein in his commentary noted that "[t]he prime guaranty of reliability in the case of prior testimony or depositions resides in their having been subjected to cross-examination prior to the present trial." 4 Weinstein's *Evidence* ¶ 804(b)(1)[02] at 804–57 (1981).

Throughout the bail hearing defense counsel were precluded from fully cross-examining Fairhurst about any promises he may have received or any arrangements he may have made with the attorney general's office in exchange for his testimony. Fairhurst was not granted immunity until April 8, 1975. Prior to this time, however, he had actively cooperated with both the state police and the prosecution. Attempting to explore the motivation behind his assistance, Anthony's counsel specifically asked Fairhurst if he was promised anything in return for statements he had volunteered before immunity was conferred. The justice presiding at the hearing repeatedly sustained the prosecution's objections to this line of questioning. He also sustained the prosecution's objection to the more general inquiry by DePari's counsel concerning any promises in addition to immunity that may have been made by either the state police or the attorney general's office if Fairhurst would testify at the hearing or in any further proceedings in the case. The hearing justice reasoned that any such promises or other offers were irrelevant because the conferring of immunity from a charge of murder was the greatest inducement Fairhurst could have obtained.

■ Although the restriction of cross-examination in this respect may have been proper for the preliminary hearing, it none-

theless limits the substantive use of Fairhurst's testimony at trial. The realm of counsel's inquiries is highly germane to the issue of Fairhurst's motives in testifying on behalf of the prosecution. The crucial concern is not the actual existence of any such deals or understandings but the witness's own expectations and how they may have affected him. *United States v. Crumley*, 565 F.2d 945, 949–50 (5th Cir. 1978); *United States v. Mayer*, 556 F.2d 245, 249 (5th Cir. 1977); *United States v. Dickens*, 417 F.2d 958, 960–61 (8th Cir. 1969). In *State v. Anthony*, R.I., 422 A.2d 921, 924 (1980), the court remarked that "[i]t is the essence of a fair trial that reasonable latitude be given the cross-examiner. This latitude should include an opportunity for a defendant to establish or reveal possible bias, prejudice, or ulterior motives as they may relate to the case being tried." [Citations omitted.] *See also State v. DeBarros*, R.I., 441 A.2d 549 (1982). A liberal scope of cross-examination is particularly important when the witness is an accomplice, *State v. Anthony*, 422 A.2d at 924, or, as in the case here, a co-conspirator and key prosecution witness. *Greene v. Wainwright*, 634 F.2d 272, 275 (5th Cir. 1981); *United States v. Crumley*, 565 F.2d at 949.

▮ As for the extent to which a defendant must be permitted to probe the motives of an immunized witness, the four cases we are aware of which have addressed this precise issue adopt the position that a defendant must not be foreclosed from thoroughly exploring the immunity agreement or other arrangements between the witness and the government. *See United States v. Reilly*, 456 F.Supp. 211, 219 (E.D. Pa.1978), *aff'd* 601 F.2d 577 (3d Cir.), *cert. denied*, 444 U.S. 903, 100 S.Ct. 216, 62 L.Ed.2d 140 (1979) (because of importance of allowing defendant to bring out the full extent of the immunity agreement, court refrained from placing any restrictions on cross-examination of key government witness in this area); *Holt v. State*, 378 So.2d 106 (Fla.Dist.Ct.App.1980) (trial court should not have precluded defense counsel's inquiry on cross-examination regarding details surrounding grant of immunity to primary prosecution witness); *State v. Schenk*, 53 Wis.2d 327, 333–36, 193 N.W.2d 26, 30 (1972) (it was error for trial court to restrict defendant's cross-examination of immunized witness as the defense has a right to know the basis for the immunity and to know if any other promises were made); *accord State v. Mac Gresens*, 40 Wis.2d 179, 186, 161 N.W.2d 245, 249 (1968); *see also* Annot. at 62 A.L.R.2d 610 (1958). We join these jurisdictions in holding that a defendant is entitled to cross-examine a witness granted immunity with regard to his or her bias or interest in testifying on behalf of the state, and this encompasses the nature of the immunity agreement and any additional promises made or understandings reached with the witness. Evaluating this lack of an opportunity to cross-examine Fairhurst fully and adequately in conjunction with the serious doubts clouding the reliability of his account, we conclude that the admission of Fairhurst's bail-hearing testimony at trial violated Anthony's right of confrontation.

Consequently, the defendants' appeal is sustained and the convictions appealed from are vacated. The indictment against defendant DePari is dismissed, and the record in the case against him is remitted to the Superior Court. The record in the case against defendant Anthony is remanded to the Superior Court for a new trial consistent with the holding in this opinion.